Helen E. DuBois

v.

Elizabeth A. Nugent et al.

[Decided March 17th, 1905.]

1. In a suit in equity for the rescission of a contract for the exchange of real estate induced by false representations, proof of defendant's knowledge of the falsity of such representations when made is not required.

2. Generally, a rescission before action brought is necessary in an action at law, but in equity a bill for rescission may be sustained although no rescission or offer to rescind has been previously made or attempted. But where the rescission depends solely on judicial action to be taken on a bill, it can be decreed only on the substantial proof of the false represen-

tations charged in the bill, and not on any other alleged false representations.

3. Where no rescission of a contract of exchange was made or attempted before the filing of the bill, and the bill was filed to obtain a rescission of the contract on the ground of alleged false representations that the orchards on the property conveyed to complainant were not affected with the "San José scale" (which allegations of the bill were untrue), and complainant, after filing of the bill, took no steps to protect the trees on the property conveyed to her from further injury by such disease, though with proper attention a large part of them could then have been saved, and defendant being under no equitable duty to rescind at the time the bill was filed because the alleged representations had not been in fact made, complainant was barred, by her negligence in failing to protect the trees, from obtaining a rescission on account of misrepresentations other than those alleged in the bill.

---

Heard on bill, answer, replication and proofs.

On September 8th, 1902, the complainant, Mrs. DuBois, and the defendant Mr. John A. Nugent, entered into a written contract for the exchange of lands, which was carried out on October 1st, 1902, by deeds of that date. The land conveyed to the complainant in the exchange was a farm owned by Nugent near Clyde, in Somerset county, on which were extensive orchards, and which was valuable mainly as a fruit farm, and the lands conveyed to Nugent were houses and lots in Jersey City. The bill is filed to rescind the contract of exchange and for a reconveyance of the properties, on the ground of alleged false representations made by Nugent during the negotiations as to the condition of the trees, which representations were relied on by complainant and induced the contract. These representations were made by circulars offering the property for sale, in which the trees, over eight thousand in number, were described as "fine, healthy and mostly bearing," and also by personal statements of Nugent to the husband of complainant, who acted for her in the negotiations, that the trees were all in sound and healthy condition and increasing in value. There was, as the bill alleges, a further representation made by Nugent, in answer to a special inquiry by DuBois, that he had never had the San José scale upon his trees. All of these representations are alleged to be false, and it is claimed that, at the time of the

contract and conveyance, seven-eighths of the trees were and had been for a long time badly infested by the San José scale, and were therefore practically worthless. The bill further charges that Nugent, at the time of making the representations, knew that his fruit trees were and had been for several months infested by this scale, and that the representations were made with the fraudulent purpose and intention of inducing the contract of exchange. There is a further allegation of misrepresentation as to the number of trees, but relief on this ground was not insisted on at the hearing.

In reference to the representations, the defendants allege that the circulars describing the trees and their condition were issued in the summer of 1901, and at the time were in all respects correct; but deny that any of these circulars came to the complainant's notice until after the negotiations for the exchange were practically consummated, and deny that during these negotiations Nugent stated at all that the trees were all in sound and healthy condition and increasing in value, and that in answer to an inquiry he said to DuBois that he had never had the San José scale upon his trees. They further allege that the scale (although not easily distinguishable on the trees, as alleged in the bill) was in fact seen on the trees by DuBois before the agreement of exchange was entered into, and that the existence of the scale on the trees on the farm was known to complainant at the time of the exchange. In reference to the existence of the scale on his trees, the defendant says that in the early part of 1902 he learned from Professor Smith, the entomologist of the State Agricultural College, that some of his trees were infested with the scale, and that he also learned of the existence of scale on his trees, and the method of treatment, from a neighbor, Mr. Mortimer Whitehead, owning the adjoining farm and an expert in such matters. As to communication of his information to DuBois, the defendant says that during all of the negotiations he gave to DuBois all the information and knowledge he had respecting the existence of San José scale on the trees, and especially his information from Professor Smith and Mr. Whitehead that it was on the trees; that the subject of the scale and its treatment was discussed between defendant and

DuBois, and the necessity of treating the trees by spraying during the winter was particularly discussed; that DuBois claimed to be familiar with the San José scale; that he had read about it and knew that if taken in time they could be doctored all right with oil, and that defendant and DuBois both believed that the scale could be exterminated in the winter following the exchange. The lands conveyed to Nugent were subsequently conveyed to his wife, as was also a mortgage for $8,000, given by complainant to Nugent upon the farm, to equalize the values of the properties exchanged and secure part of the consideration. These transfers to the defendant Mrs. Nugent are, however, admitted by the answer and on the hearing to have been purely voluntary, and the case is to be considered as if Nugent still held title to the lands and mortgage.

*Mr. Alan H. Strong,* for the complainant.

*Mr. Randolph Perkins* and *Mr. Gilbert Collins,* for the defendants.

EMERY, V. C. (after statement of issues).

The points to which the arguments were principally directed at the hearing were—*first,* the representations made as to the condition of the trees and the existence of the scale on them during the treaty for purchase or exchange, and whether the charges of the bill in this respect were proved; *second,* the truth or falsity of the representations made; and *third,* whether the complainant has not by his action and conduct since the exchange and since the time of his alleged discovery of the falsity of defendant's representations deprived himself of the equitable remedy of rescission of the contract, not only by an election to ratify and stand by the exchange, but by such neglect of proper treatment of the trees and orchards as to make rescission of the contracts now inequitable and unjust.

The extent to which the trees were actually infected by the scale at the time the exchange was made and when complainant took possession under the agreement (October 15th, 1902), was another point to which considerable evidence (expert and other)

was directed. The dispute between the parties on this evidence, however, is whether (as complainant claims) at that time the condition of the orchards was such that a large part of them was practically worthless, by reason of the existence of the scale, or whether (as defendant claims) the orchards, although infected by the scale to an extent requiring thorough treatment as soon as practicable, could have been freed from the pest by proper treatment and at a comparatively small expense. But there can be no doubt, I think, that the existence of the scale in the orchards, even to the extent shown by defendant's evidence, so affected the value of the orchards as to make any representation that they were free from it material as well as false.

Certain principles controlling courts of equity in relation to the rescission of contracts which have been entered into and executed in reliance upon representations of fact which are material and which are subsequently found by the complaining party to be untrue, seem to be entirely settled. In these cases the mere falsity of a material representation entitles the injured party to the equitable remedy of rescission, if applied for with the promptness required by all the circumstances of the case. Proof of the defendant's knowledge of the falsity of the representation is not considered as essential to the right of rescission, nor is the honest belief of the defendant in making the representation a bar to this relief, as it may be in a common law action for deceit. At law, fraudulent intent, or, as is sometimes said, moral fraud, must be shown to have existed, while in a court of equity the complainant may succeed although the representation was innocent. *Cowley* v. *Smyth, 40 N. J. Law* (*17 Vr.*) *380, 393 (Supreme Court, 1884)* ; *Eibel* v. *Von. Fell, 55 N. J. Eq. (10 Dick.) 670 (1897).* In *Cowley* v. *Smyth, supra,* it was decided that in an action for deceit for false representations as to the solvency of a bank, of which the defendant was a director, fraudulent intent must be proved, and it should be left to the jury to say whether the defendant made the representations with a fraudulent purpose or whether he made them in good faith and in the honest belief that they were true. This decision has since been considered as establishing

the broad rule that in such common law actions the fraudulent intent to deceive must be proved. *Eibel* v. *Von Fell, 63 N. J. Law (34 Vr.) 3 (Supreme Court, 1899)*; affirmed on writ of error, in *64 N. J. Law (35 Vr.) 364 (1899)*, for the reasons given in the supreme court.

In the early case of *Snyder* v. *Findley, 1 N. J. Law (Coxe) 48, 51 (1791)*, Chief-Justice Kinsey, at *nisi prius*, ruled that at law a false representation inducing the contract in that case (taking the note of a third person in payment for goods sold on the representation that the note was good) was fraudulent, whether innocent or not, but this ruling, if inconsistent with the later cases, must be considered as overruled, and as important only for its bearing on the question debated (in *Derry* v. *Peek, infra*, and elsewhere) as to the original doctrine of the common law. *Newbigging* v. *Adam, 34 Ch. Div. 582, 594 (Lord Bowen, 1886)*; Sir F. A. Pollock, in *5 Law Qu. Rev. 410*, and cases cited; *2 Pom. Eq. Jur. (2d ed.)* § *884*, cases cited in note; *15 Cent. L. J. 327*. The rule settled in *Cowley* v. *Smyth, supra*, is that of the leading case, *Derry* v. *Peek, 14 App. Cas. 337 (1889)*, decided in the house of lords, in which, after great consideration, it was finally settled, in England, that in a common law action for deceit an honest belief of the defendant in the statements made was a defence, and that the fact that the belief was not, in the opinion of a court or jury, founded on reasonable grounds, did not of itself make the representation actionable, although the reasonableness of the grounds of belief might be considered on the question of honesty in entertaining it. The rule that in equity the complainant may rescind, although the representation was innocent, was stated and applied by Vice-Chancellor Stevens, in *Eibel* v. *Von Fell, supra*, in a case where the representation of a vendor (assumed to be innocent) was that the house was as good as new, but in fact contained rotten timbers. The reasons given for extending the equitable remedy of rescission to cases of innocent misrepresentations, which have induced a sale, has been best stated by Sir George Jessel, in *Redgrave* v. *Hurd, 20 Ch. Div. 1; 51 L. J. Ch. 117 (1881)*: "It was put in two ways, either of which was sufficient to induce a court of equity to

rescind. It was said, 'A man is not to be allowed to get a benefit from a statement which he now admits to be false.' That is one way of putting it. The other way of putting it was this: 'Even assuming that you want moral fraud in order to set aside a contract, you have it where a man, having obtained a beneficial contract by a statement he now knows to be false, insists upon keeping that contract.' That, of course, is a moral delinquency; no man ought to seek to take advantage of his own falsity. It does not matter which way it was put, but that was the rule in equity." This equitable rule had been previously declared in *Rawlins* v. *Wickham, 3 De G. & J. 304 (1858)*, and *In re Reese Silver Mining Co., L. R. 2 Ch. App. 604 (1866)*, and was approved in *Redgrave* v. *Hurd, 20 Ch. Div. 1 (1882)*, and where, in the opinion of the court, the representation was made without reasonable grounds for believing it true, the right to rescind was considered to be based on even stronger grounds. *Reese Silver Mining Co., supra; Kountze* v. *Kennedy, 147 N. Y. 124, 133 (1895)*.

In *Derry* v. *Peek, supra,* the equitable rule in cases of rescission is recognized as settled, and the question mainly examined in the elaborate opinions of the judges is whether the justices of the court of appeal rightly applied to a claim, which was substantially an action for deceit, the equitable rules in cases of rescission. This equitable right to rescind for false representations innocently made is recognized, also, by other courts, which hold fraudulent intent necessary in actions for deceit. *Kountze* v. *Kennedy, 147 N. Y. 124, 129 (1895)*.

On the authority of these cases, therefore, I conclude that if the representations as to the condition of the trees and the absence of the scale alleged in the bill are proved to have been made, and to have been the representations which induced the contract, and they are false, the complainants, on the discovery of the untruth of the representations, had then an equitable right to rescind the contract, whether the representations were innocent or fraudulent. If the representations and their falsity are satisfactorily proved, the allegations, as to their willful and fraudulent character, may, so far as any right to rescind is concerned, be considered as superfluous or unnecessary.

The first and the principal question of fact to be determined is what representations were made by Nugent during the negotiations in relation to the condition of the trees and the scale, and what information had DuBois in reference to the scale on the trees at the time of the contract or exchange.   (The evidence on this subject was voluminous and is stated .and considered in detail in a separate memorandum filed for the information of the parties, and the opinion proceeds.)

Upon the whole evidence, my conclusion as to the representations made by Nugent to DuBois is, that during the treaty for exchange, and both by circulars which came to DuBois' attention and in the personal interviews, Nugent represented that the trees were sound and healthy and fruitful, but that during the negotiations, and before the contract of exchange was made, Nugent also disclosed to DuBois the existence of scale in one of the large orchards and in the small kitchen orchard, and that he actually showed DuBois the scale on a few trees in those orchards.   And I find, further, that DuBois concluded the exchange actually knowing of the existence of scale upon a few trees, and, supposing that to some extent it infected other trees, and that some treatment of the orchards was necessary for their protection from the scale.   So far, therefore, as the right to rescind the contract or to relief under the bill depends upon the charge of a false representation by Nugent that there was no scale in the orchards, the complainant's claim is not sustained by the proofs.   It was, however, insisted by complainant's counsel at the hearing that on the disclosures made by Nugent, taking his evidence to be true, the complainant is now entitled to relief upon the ground that Nugent, during the whole negotiation, certainly represented the trees to be sound and healthy trees; that this representation charged in the bill was false by reason of the extent of the scale; that Nugent, by his words and conduct, misrepresented the extent to which the scale existed on the trees and its danger, and misrepresented, also, the statements made to him by Mr. Whitehead in relation to the extent of the scale and its danger.

But this is not a case where, either on the pleadings or proofs, the charges of misrepresentation in reference to the condition of

the trees can be separated from those in regard to the scale. No other disease or source of unsoundness than the scale is alleged in the bill or shown by the proofs, and if I have rightly apprehended the present case, as it now stands on the pleadings and proofs, it is one where the ultimate substantial question is whether Nugent disclosed to DuBois the existence of the scale in the orchards as a disease or pest, for which the orchards (otherwise sound and healthy) must be treated, and whether the exchange was made by DuBois with that understanding, or whether Nugent denied its existence in the orchards, and the exchange was made on that basis. Treated as a question of formal pleading or procedure, relief to the complainant on the ground that, although the existence of the scale as a disease was disclosed, the extent of it was misrepresented or was not disclosed would be, I think, a substantially different claim from that set up in the bill. This charge, and the contention also made at the hearing that Nugent misrepresented Whitehead's statements, and that his own statements about the danger from the scale were dishonest, or such as he had no reasonable ground to entertain, are issues substantially different from the one now raised on the pleadings, viz., that no disclosure of this disease or unsoundness was made, and it would not be safe to assume that the evidence in this case contains all the evidence on either side which would have been produced had these been the issues on the record. But the question of the character of the misrepresentations charged by the bill has a more important aspect than that of mere form or pleading. The bill is one for the rescission of executed contracts and deeds, on the ground of alleged false representations, and the bill itself is the first and only act of the complainant indicating her election to avoid the contract. The equity to have the contracts and deeds rescinded arises against the defendant, because of the substantial truth of the charges of misrepresentation made in the bill; and if these charges are untrue as made, defendant is under no equitable obligation to rescind, and is not guilty of any fraud, either legal or moral, in not offering to rescind the contract upon this bill containing these unfounded charges being filed. The formal charges of misrepresentation first made in the bill for rescission, and upon

which the election to avoid the contract is based, become, there-fore, matters which reach to the substantial equity of complain-ant's suit, viz., his right to insist that the defendant's reten-tion of the property conveyed to him is in equity a fraud, because he knows now, by the charges of the bill, that the repre-sentations, upon the faith of which the exchange was made, are false, and that in equity he should, knowing or learning their falsity, offer to rescind.  It appears in this case that from the time, or shortly after the time, when DuBois discovered the extent of the scale, he has charged Nugent (falsely, I think) with having told him the place had no scale on it, and has, up to the time of filing the bill, insisted on this claim of false representation on Nugent's part, and now by his bill claims to rescind on this account.  So long as the bill takes this false position as to what took place between DuBois and Nugent in regard to the disclosures, no equity arises against Nugent which would require him to rescind the contract and return the prop-erty, nor can there be said to be any fraud, moral or legal, in retaining property whose return is demanded on a charge of misrepresentation which is false.

For these reasons I conclude that relief cannot be granted to the complainant on this bill, if the conclusions I have reached as to the actual disclosures made by Nugent as to the scale are correct, and that the misrepresentations charged in the bill have not been proved.

This conclusion disposes of the question of the representa-tions made and their falsity, and, if correct, determines the case against the complainant.  But the further question of DuBois' conduct after his discovery of the existence and extent of the scale should be considered briefly, because it has a direct bear-ing on the right of rescission claimed in the bill, either as show-ing his election to stand by the contract after the discovery of the alleged fraud or as so long delaying the claim to a rescission that it would now be inequitable.  The discovery of the extent of the scale was made by DuBois certainly not later than the visit of Professor Smith, November 16th, 1902, and probably somewhat earlier.  Although DuBois, after this time, complained frequently in his letters and interviews about the destruction of

the orchards, he did not, in any of them, indicate that he desired to rescind the contract, but did, in some of them, expressly ask some compensation or new arrangement in reference to the $8,000 purchase-money mortgage, which he could not now carry or pay off by reason of the reduced income of the farm, resulting from the condition of the trees. And on this basis of continuing to stand by the exchange, leaving open the question as to a claim for compensation, he carried out, after the discovery of the falsity of the alleged representations, several of the provisions of the contract of exchange relating to the personal property, which were not completed when the deeds for the real estate were exchanged. He also disposed of the crops on the farm, and in all of his letters to Nugent indicates his intention to keep the farm. There was no actual rescission nor any attempt or offer to rescind the contract before the filing of the bill, and the bill is based not on any previous rescission, but is itself the procedure for rescission by judicial action. Generally, a rescission before action brought is necessary in an action at law (*Conlan* v. *Roemer, 52 N. J. Law (23 Vr.) 53, 58*), but in equity a bill for rescission may be sustained, although no rescission or offer to rescind has been previously made or attempted. The distinction between the two classes of remedies is, that the action brought at law is generally based on the theory that the rescission has already been legally completed by the action of the injured party, while the equitable remedy reaches also to a rescission by judicial action, based on the right to rescind for the reasons charged in the bill. *Gould* v. *Cayuga Bank, 86 N. Y. 75, 83 (1881)*. But where the rescission depends solely on judicial action to be taken on a bill, it can be decreed, I think, only on the substantial proof of the false representations charged in the bill, which complainant has elected to set out, and not on any other alleged false representations.

If DuBois had in fact satisfactorily made out the claim set up in his letter of November 16th, 1902, and in his bill, that Nugent had told him the scale was not on the place, I am not prepared to say that his acts in subsequently carrying out the exchange would indicate an election, for it will be observed that Nugent never replied to this charge in DuBois' letters or answered his

inquiries, and the time consumed in waiting for a reply (which DuBois was entitled to if there had never been any disclosure), or the acts done during this interval, would not be sufficient to prove an election. But, on the other hand, if the charge was false, and known to be false, then DuBois' delay in rescinding, or offering to rescind, the contract, until he could get some answer to the false charge, must be taken against him, rather than in his favor, and in connection with his carrying out of the incomplete parts of the contract, and continuing the complete control of the farm must be considered, I think, as sufficient evidence that before filing the bill he had elected to stand by the contract, hoping, however, to procure an abatement in the price by reason of the great extent of the scale. By the last letter written by DuBois, on January 31st, after the bill had been filed (January 13th) and subpœna served, and in reply to Nugent's long letter of January 4th, it appears, I think, that one object of DuBois in filing the bill to rescind was to procure an abatement of the price. In this letter, after charging Nugent with misleading statements as to the trees in his circulars (omitting, however, any reference to Nugent's statement about the scale), he justifies an appeal to the courts, and concludes his letter by asking, "Don't you think that you should reconvey her city property, or at least make her some reasonable allowance for the diseased condition of the trees?" An election to stand by the bargain, once made, is final and cannot be recalled. *Dennis v. Jones, 44 N. J. Eq. (17 Stew.) 513 (Court of Errors and Appeals, 1888)* ; *Arnold v. Hagerman, 45 N. J. Eq. (18 Stew.) 186, 196 (Court of Errors and Appeals, 1888)*.

The other question whether a rescission of the exchange, first asked by the filing of the bill on January 13th, 1903, is applied for too late, even if there had been no election, is not raised by the answer, but was raised at the hearing and argued. The evidence, considered on all sides, gives rise to some doubt whether, if Nugent had, on filing the bill, consented to the rescission (supposing it to be established on the proofs that the contract should be rescinded, and that equitably, therefore, he should have consented to it on the filing of the bill), his situation in reference to the treatment and care of the orchards would have been sub-

stantially different from what it was at the middle of November, when DuBois received from Professor Smith reliable information as to their condition and the extent of the scale. While most of the expert fruit-growers think the spraying, if done with oil, is best applied as late as February and March, yet I think the evidence shows that as soon as the leaves are off— that is, from November—the treatment of the orchards is often taken in hand. Mr. Whitehead seems to have commenced on his own orchard as soon as the leaves were off. But Nugent himself, as appears by his letters, both to Chrysler and DuBois, and by his evidence, thought February or March early enough to undertake the complete and· thorough treatment of the orchards, and the weight of the expert evidence favors this view. If, therefore, the situation as it existed at the date of filing the bill is the standard or criterion to which the equities of the parties, as to change in the situation, are to be referred, there was no substantial change in the condition of the orchards up to that time.

It appeared by the evidence that subsequent to the filing of the bill, and in the spring of 1903, DuBois made no effort, by spraying or otherwise, to protect the orchards, and that at the time of the hearing, in 1904, most of the orchards were practically dead, and the farm, as a fruit farm, practically worthless. It is clear, by all of the evidence, that unless attended to in the fall and winter of 1903-1904, at the latest, there was no hope of saving the orchards. Two of Mr. Nugent's witnesses— expert fruit-growers—who have had large experience with orchards infected by scale, and who examined the orchards in June, 1903, say that the larger portion of the orchards could then have been saved by treatment in the winter of 1904, but their examination of the orchards was somewhat hasty, and as to the extent of the scale in the spring of 1903 the evidence of Chrysler, who had charge of the orchards under Nugent, and afterwards under DuBois, seems to be more reliable. He says that in the spring of 1903 there were two or three hundred of the plum and peach trees which were entirely dead, and that about a third of the trees needed to be "headed back" in order to save them; that the other two-thirds could have been saved, he thinks, by

spraying. There is no doubt that by the neglect to treat the orchards after the filing of the bill they were, at the time of the hearing, destroyed beyond any hope of restoration, and the question is whether this neglect of the orchards since the filing of the bill is to have weight in affecting the equitableness of a rescission. It is insisted, on behalf of DuBois, that after his election to rescind, made by filing the bill for that purpose, the risk of any subsequent change in the condition of the property affected is upon the defendant, if a decree for rescission go eventually for the complainant. Generally speaking, this position is a sound one, and the reason is that if the claim for rescission set up in the bill is well founded, the defendant acts inequitably in refusing to rescind at once. If the charge in the bill that Nugent denied the existence of scale in the orchards is satisfactorily proved, then the result is that on the filing of the bill making this false representation the ground of rescission, it was Nugent's equitable duty to have consented to the rescission at once, and the subsequent change in the condition of the trees will not relieve him from this duty, even if it is due to DuBois' failure to care for the trees. But, if my conclusion as to the facts at issue in the cause is correct, that this charge of the bill, on which the claim to rescind has been based, has not been made out, then, of course, no equitable duty to rescind has at any time been imposed on Nugent by reason of the claim for rescission made in the bill, and if relief at the hearing on the proofs is asked for on account of misrepresentation or conduct substantially different from that relied on in the bill, then the change in the condition of the trees pending the suit, and up to the time of hearing, should be considered as at the risk of the complainant, and I think would make any rescission now inequitable. I will advise a decree dismissing the bill.