Defendant Leber was jointly indicted with a son-in-law named Epstein, who was also separately named in another indictment. Leber entered into a recognizance, or conveyed the legal title to some real estate, and the grantee became surety for Epstein, who fled the jurisdiction of the court. Leber then sought the services of the complainant, an attorney-at-law, to secure Epstein's return so as to apply for and obtain an opening of the judgment of forfeiture of bail that had been entered on account of Epstein's default. It was agreed between these two that Leber should deposit with a bank the sum of $5,000 in cash, upon the condition that when Epstein should be prevailed upon to return and surrender himself and the judgment of forfeiture be opened, the depository should then pay over the above sum to the complainant as compensation for his services. It was further agreed that nothing should be paid to the complainant unless he was successful in carrying out his contract. Upon the making of the foregoing agreement the complainant and Leber went to the bank agreed upon and saw one of its vice-presidents, the defendant Hardon, who signed a statement in *Page 721 
which he acknowledged having personally received from Leber the said sum of $5,000 in cash for the purpose aforesaid, when, in fact, all he had taken was a promissory note that subsequently proved worthless. On the faith of what Hardon had told him, the complainant exerted great effort in carrying out his part of the bargain, and secured the services of no less than four other lawyers, to whom he is indebted. The complainant effected the return of Epstein, as well as the setting aside of the judgment of forfeiture of bail, thus completing his share of the agreement. At the end of the final hearing it was decreed that Hardon should not be allowed to say that he did not have the money he had misrepresented as being in his hands, and that he should pay to the complainant $5,000. There were two others defendants, but, by consent, no relief was decreed as against anyone but Hardon. A copy of this decree has been served upon Hardon and a demand made thereunder.
More than a reasonable time having elapsed and no payment of the decree having been made, complainant now moves to have Hardon adjudged in contempt of court and punished for his recalcitrance. His defense to the motion is that the performance of the decree is beyond his power, and cites the case of Grand Lodge, c., v.Jansen, 62 N.J. Eq. 737. On the return of the order to show cause why he should not be punished he presented himself and was sworn in his own behalf. He testified that for a considerable period of years it has been his invariable practice to turn his salary received from the bank over to his wife, in full; that she discharges all the expenses of their family, which includes a married daughter and two grandchildren; that he does not eat any midday meal and, therefore, receives from his wife only his carfare and the money for such absolute necessaries as clothing. His salary is $9,000 a year, paid to him in equal semi-monthly installments. During the year 1925 he was paid $8,000; during 1924, $7,000. When interrogated as to his earnings before 1924 he insisted that he was unable to remember. It is not without significance that the unusual *Page 722 
practice in his station in life of making his wife the treasurer of the family was instituted some years ago when he became liable under a judgment of the supreme court for the debt of another. He also testified that he had no bank account; that he owns no stocks, bonds or other securities. He was unable to give any estimate of the expense of maintaining his home. He had no idea of the balance in his wife's bank account. He was unable to state whether or not she had invested any savings out of his income in securities or otherwise except, as I recall it, a trifling sum in some debentures of more sentimental, than financial, value.
Toward the close of his cross-examination he was asked if he would furnish a transcript of his wife's bank account covering the last past year, to which he replied that he did not believe his wife would consent, though admitting that they lived on very friendly terms. Following this surprising answer, he was relentlessly pressed, and finally agreed to seek her permission to obtain the transcript. This story, when viewed in the light of all the surrounding circumstances, is not persuasive that the defendant Hardon has made any bona fide or whole-hearted effort to obey the decree. Here is a man occupying a dignified and remunerative position, who has been in receipt of a large salary for many years, and who has not only saved nothing, but has adopted a course of living at variance with his station in life; decided upon, however, only after he has once been caught in the toils of the law and compelled to discharge a legal obligation for which he was not primarily responsible. Then, and not until then, he says, did he put into operation the plan to divest himself of all power to respond to a decree against him. But he has selected as the recipient of his bounty the person most likely to care for his money and other property as he may direct and with the utmost fidelity to his interests. All these things, taken in connection with his reluctance to subject the financial affairs of his wife to the scrutiny of the court, and ultimately his entire failure so to do, lead me to disbelieve that it is not within his power to render obedience to the final decree. *Page 723 
It is argued in his behalf, however, notwithstanding such finding of fact, that it is not within the power of this court to commit him until he shall have complied with its order, because of the constitutional limitation on imprisonment in civil cases. In support of this argument there is cited Aspinwall v.Aspinwall, 53 N.J. Eq. 684. In that case the respondent in the court of errors and appeals had failed to pay to the appellant, his wife, a sum of money decreed to be due her under articles of separation, and the chancellor had refused an attachment as for a contempt. This decision was affirmed by the court of errors and appeals because they say that under our statute the proper remedy would have been either sequestration of the respondent's estate or an execution against his lands and goods. Originally, of course, this court could only enforce its decrees in personam, because there were no other means by which that object could be attained, but, by statute now, execution may be issued out of this court with like force and effect as those issuing out of the supreme court, and, therefore, ordinarily, recourse may only be had to such statutory processes by reason of article 1, section 17 of the constitution of this state. But that section of the constitution goes further in a saving clause, and says that no person shall be imprisoned on any judgment founded upon contract "unless in cases of fraud." By necessary inference, this means that imprisonment may be resorted to in cases of fraud. Ex parteClark, 20 N.J. Law 648. In the Aspinwall Case this exception was specifically noticed in the opinion of the present chief-justice when he said:
"In my opinion, the effect of this legislation was to do away with the process of contempt, as a method of enforcing decrees for the payment of moneys due upon contracts between the parties, in cases where no special equities exist, and to substitute, therefore, sequestration of the defendant's estate, the writ offieri facias against his real and personal property, and, in cases of fraud, the writ of capias against his person."
Therefore, if the necessary fraud has been shown, the case at bar does not come within the rationale of the Aspinwall *Page 724 Case, Walton v. Walton, 54 N.J. Eq. 607; Grand Lodge Knightsof Pythias v. Jansen, supra, or Smith v. Smith, 84 N.J. Eq. 299.
The guaranty of the constitution is for the benefit of the honestly unfortunate, and not for one who has brought his own troubles upon his head by inequitable conduct that would be called by a less euphonious name in a court of law. Ex parteClark, supra. That the transaction is tainted with fraud has already been decided in the opinion delivered upon the close of the final hearing. It only remains to determine whether or not it is such fraud as is contemplated by the constitution.
At the time I rendered the oral opinion in this case, I indicated that while I did not find this defendant guilty of actual fraud, there had been constructive fraud by reason of the relation existing between the complainant and this defendant, as described in sections 955 to 965 of Pomeroy's EquityJurisprudence. In making this statement, I incline to the opinion that I was wrong. The natural and inherent aversion of imposing any additional pain upon, or embarrassment to, another where it is unnecessary to the ends of justice, led me to minimize the obliquity of the defendant's action in the eyes of this court. If a finding of constructive fraud would be sufficient to protect the rights of the complainant, it was, of course, distasteful to find this defendant guilty of the more serious character of fraud. I am now convinced that the conduct of this defendant amounted to actual fraud.
Malice is not a necessary element of fraud of this description:
"In order that a statement may be a fraudulent misrepresentation, the party making it need not have any malignant feeling towards the other, nor any desire to injure, nor need he be actuated by any corrupt or wicked motive; for equity looks at the relations of the statement towards the real facts, and the results which will naturally flow from it, rather than at the mental condition, temper and feelings of the person who makes it. If, therefore, a representation made prior to the transaction, and directly relating to it, is of such a character that it would naturally and reasonably induce, or tend to induce, any ordinary person to act upon it, and enter into the contract or engage in *Page 725 
the transaction, and is, in fact, followed by such action on the part of the other person, then it will be presumed that it was made for the purpose and with the design of inducing that person to do what he has done, * * * that is, to enter into the agreement or engage in the transaction. The design will be inferred from the natural and necessary consequences." 2 Pom.Eq. Jur. § 880.
Neither is it necessary that the misrepresentation upon which the defrauded party acted need be intentional on the part of the person making the same. While at law such moral wrong is required, the rule is far broader in equity. 2 Pom. Eq. Jur. §§885, 889; Eibel v. Von Fell, 55 N.J. Eq. 670; DuBois v.Nugent, 69 N.J. Eq. 145.
But even if it be assumed that the defendant absolutely believed that the note which he held for the complainant's protection (and which turned out to be no protection at all) was the exact equivalent of so much cash, even that cannot avail him, because some time within a period of three months, and probably within a very few days after the transaction with the complainant, this defendant learned unequivocally that the note just mentioned was of absolutely no value for the purposes for which it was given. Not even then was one word said to the complainant to acquaint him with the fact that the man upon whom he relied did not have a dollar for his protection. This silence was maintained, and this information withheld, for a period of approximately one year, until the complainant's services had been complete, his position had changed for the worse, and he demanded his reward. Even then, the responding defendant failed to disclose the true situation and put the complainant off with the statement that he would be obliged to communicate with Leber and secure that defendant's consent before turning over the fund. And even thereafter, his excuse for the non-payment thereof was that Leber pretended that there was a further condition upon which the complainant's compensation was to depend, not mentioned in the written instrument, and said by Leber not to have been accomplished by the complainant. It was not until the answer in this cause was filed on Hardon's behalf that the complainant learned that the $5,000 had never *Page 726 
been deposited in the hands of Hardon or with his bank. This suppression of knowledge, which it was the duty of Hardon to disclose, in itself constitutes actual fraud.
"Where such an untrue statement is made in the honest belief of its truth, so that it is the result of an innocent error, and the truth is afterwards discovered by the person who has innocently made the incorrect representation, if he then suffers the other party to continue in error, and to act on the belief that no mistake has been made, this, from the time of the discovery, becomes, in equity, a fraudulent representation, even though it was not so originally." 2 Pom. Eq. Jur. § 888.
The conduct of Hardon having amounted to actual fraud, and being the very basis of the decree against him, and having found as a fact that he has not sustained the burden of proving the poverty he alleges, I feel that the complainant is entitled, exdebito justitiae, to the assistance of this court in compelling this defendant to respond to its decree. His having placed his property beyond the reach of the ordinary processes of our practice has made it necessary to resort to the extremest measure.
I will advise an order adjudicating that the defendant Hardon has committed a civil contempt, and that the proper writ go.