SADIE URBACK, PLAINTIFF-APPELLANT, v. METROPOLITAN LIFE INSURANCE COMPANY, DEFENDANT-RESPONDENT.

Submitted February 13, 1943—Decided May 13, 1943.

For the appellant, *Klein & Klein* (*Edward Gaulkin*, of counsel).

For the respondent, *George W. C. McCarter*.

The opinion of the court was delivered by

HEHER, J. Plaintiff was designated as beneficiary of a limited payment life income policy of insurance issued May 1st, 1936, by the defendant insurer upon the life of her husband, Jack; and, upon the insured's death on November 9th, 1937, she instituted this action to recover the stipulated payments. The answer pleaded false and fraudulent representations respecting the insured's prior ailments and diseases, hospitalization, surgical operations, and medical consultations.

A previous trial of the action resulted in a verdict for plaintiff. The judgment entered thereon was reversed by this court on the ground that the trial judge had errred in submitting to the jury the issue of whether the answers to the questions propounded by the insurer in the application for insurance respecting the matters adverted to were material to the risk. It was held that their "materiality is not the subject of findings of fact by a jury." *Urback* v. *Metropolitan Life Insurance Co.*, 127 *N. J. L.* 585. On the retrial, the judge found that, as regards the inquiries pertaining to "medical advice and treatment," the evidence was conclusive of fraud by the insured, and he accordingly directed a verdict for defendant. The appeal is from the consequent judgment.

Respondent maintains that the evidence definitively established that in this and other respects the insured was guilty of "fraudulent misrepresentations," and consequently there was no error in the direction of a verdict in its favor. It is said that "the materiality of the questions asked and answers made to them by the insured is the settled law of the case on the first appeal," and there "is no dispute whatsoever in the evidence."

But this reasoning fails to take into account well-established principles of law applicable to cases of this class. The statute obliges the insurer to incorporate in every policy of life insurance a provision, *inter alia,* that "all statements purporting to be made by the insured shall, in the absence of fraud, be deemed representations and not warranties." *Comp. Stat., p.* 2868, § 94; *R. S.* 17:34-15. The policy here contains such provision. To avoid at law a policy of life insurance on the ground of misrepresentation in respect of matters material to the risk, it is requisite that moral or conscious fraud be established. False representations are not alone sufficient. They must be made with a fraudulent intent, *i. e.,* an intent to deceive. This is the settled interpretation of the cited provision. *Kerpchak* v. *John Hancock Mutual Life Insurance Co.*, 97 *N. J. L.* 196; *Prahm* v. *Prudential Insurance Co.*, 97 *Id.* 206; *Metropolitan Life Insurance Co.* v. *Tarnowski*, 130 *N. J. Eq.* 1; *Shapiro* v. *Metropolitan Life Insurance Co.*, 114 *Id.* 378. The materiality of a false rep-

resentation is a question of law rather than one of fact for the jury; but it is not incumbent upon the insured to include immaterial matters in his answers to questions put by the insurer; and, as to material matters, the falsity of the representation is not a ground of avoidance unless it is knowingly and willfully made. A false statement or concealment is regarded as material "if the knowledge or ignorance of it would naturally and reasonably influence the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium." *Kerpchak* v. *John Hancock Mutual Life Insurance Co., supra.*

The insured died of a brain hemorrhage at the age of thirty-nine. For a period of nine months, beginning in April, 1933, he suffered intermittent "fainting spells." He finally called upon a physician and requested "a check up." The physician suggested that he visit the New York Hospital "for a diagnosis work-up." He said that "it wasn't a regular visit; he just called me and I sent him over there." The insured was admitted to the hospital on January 2d, 1934. There, he was given a thorough physical and neurological examination by four physicians over a period of five days. The result was "completely negative." A urinalysis "was completely normal." A Wasserman test was negative. When he entered the hospital he was suffering from a cold and a finger infection; but there was no evidence of "organic disease," nor was there any indication of "illness or disease." The cause of the fainting spells was not discovered. The local physician treated him for tonsilitis shortly before his admittance to the New York Hospital, and for the same condition shortly after his return. He concluded that his tonsils should be removed, and this was done at the Beth Israel Hospital in Newark. This physician was also a member of the staff of the New York Hospital. In due course, he received the findings made by the medical staff of that institution; and his conclusion was that the fainting spells were attributable solely to "hysteria due to stress and strain from his financial reverses." He found "his condition was perfectly normal." He advised him that the physicians at the New York Hospital "didn't

find anything the matter with him." His tonsils were removed while he was under a general anesthetic; and this course, the physician said, would not have been pursued unless he was "in good condition." Thereafter, he "thought" the insured's condition "was perfectly normal." He considered him "a strong man." There was evidence that the insured never again had a fainting spell; and there was none to the contrary. In February, 1936, the insured consulted another physician concerning a possible injury to his chest as the result of "pressing his chest against the rear" of a stalled motor vehicle in an endeavor to move it. An X-ray of the chest was negative; and the physician could find no evidence of injury or disease. He was called to attend the insured when the fatal illness overtook him. Death had ensued when he arrived. The cause of death was an acute subarachnoid hemorrhage. He had not treated the insured in the period intervening the injury to his chest and his death. He described him as "very robust; physically well-built, well-developed." There was evidence that he worked long hours without fatigue, and that he lost no time from his work except during the periods of hospitalization referred to.

One of the questions propounded to the insured (No. 5) was whether he had "ever been an inmate of, or * * * ever received treatment at an asylum, hospital, sanitorium or cure;" and, if the answer was in the affirmative, he was requested to "give date, duration, name of ailment and name of institution." The answer was: "Yes—appendectomy 1909, Beth Israel Hospital—10 days—Dr. V. Parsonnet, M.D." Another question (12-F) was whether he "ever had any surgical operation." His reply was: "Yes, see number 5." It is said that concealment of the examination at the New York Hospital and of the tonsilectomy is conclusive proof of an intent to deceive. We are not of this opinion.

These questions were framed in the singular, and therefore the answers were literally true. There was no statement that the appendectomy was the only occasion for hospitalization and surgical treatment. The answers were complete responses to the questions; and the insurer will not now be heard to say that they were lacking in fullness as to matters material

to the risk. Forfeitures are not favored in the law; and, in case of ambiguity, such inquiries are to be interpreted strictly in favor of the insured. *Henn* v. *Metropolitan Life Insurance Co.*, 67 *N. J. L.* 310; *Hanrahan* v. *Metropolitan Life Insurance Co.*, 72 *Id.* 504; *Massachusetts Accident Co.* v. *Stone*, 127 *N. J. Eq.* 97. If, by reason of an ambiguity in the form of the question, the answer "may state the truth or may state a falsehood according as the ambiguity is resolved," the question is construed most strongly against the insurer. *Mackinnon* v. *Fidelity and Casualty Co.*, 72 *N. J. L.* 29. The insured was warranted in treating the inquiries in strict literalism. Considering the frame of the questions, it cannot be said that the evidence conclusively reveals an intent to deceive on the part of the insured.

These questions were also answered in the negative: "12 (g) Have you consulted a physician for any ailment or disease not included in the above answers? 13. What physician or physicians, if any, not named above, have you consulted or been treated by within the last five years, and for what illness or ailment? If none, so state."

It has long been the settled rule in this state that such questions are not untruthfully answered if there be no reference to medical consultations respecting indispositions in their nature merely transitory and temporary, and palpably not material to the risk—such as have no relation to general health or vital organic functions. These are not comprehended in the terms "disease" and "ailment," as ordinarily employed in contracts of life insurance. Fraudulent nondisclosure connotes awareness that the illness or ailment is not merely "transitory" or "temporary" in the accepted sense. *Claylon* v. *General, &c., Assurance Corp.*, 104 *N. J. L.* 364; *Zoch* v. *Metropolitan Life Insurance Co.*, 117 *Id.* 295; *Batts* v. *Eastern Mutual Life Insurance Co.*, 123 *Id.* 121.

It was a question for the jury whether the insured, in the responses thus made to the insurer's inquiries, was guilty of moral or conscious fraud. An intent to deceive did not indisputably appear. In this regard, the evidence was reasonably susceptible of divergent inferences. The searching physical and neurological examinations given the insured at the New

York Hospital did not reveal an ailment or disease. There was no discoverable pathological basis for the fainting spells. Eventually, his attending physician ascribed this condition to financial stress, and advised him that he was not diseased. Likewise, the question of fraud in the failure to disclose the tonsilectomy was essentially one for the jury. Tonsils are frequently removed as a preventive against colds and like inflammations and to avert the danger of infection; and whether the insured's lay mind deemed this a "surgical operation" within the scope of the inquiry was peculiarly the province of the triers of the facts. As to this, see *Rogers* v. *Atlantic Life Insurance Co.*, 135 *S. C.* 89; 133 *S. E. Rep.* 215; 45 *A. L. R.* 1172. In the circumstances, it was for the jury to say whether non-disclosure of the tonsilectomy was induced by an intent to deceive. The insurer's physician subjected the insured to a thorough physical examination. He testified that he examined the insured's throat but could not recall what he found as to the tonsils. He said: "There is no question here as to whether he had tonsils or not. The question is whether he had any disease of the nose or throat." What his examination revealed in this regard is imputable to his principal. He found that the insured was a "first class" risk. Moreover, this physician put to the insured the inquiries contained in the application; and it is not without significance that his evidence tends to show that, in stating the questions, he depended largely upon his recollection as to their content, based upon long experience, and that he did not "record" the insured's "answers exactly the way he gave them in his own words," but "abbreviated them where" he "found" that that could be done.

The judgment is accordingly reversed, and a *venire de novo* awarded; costs to abide the event.

*For affirmance*—Parker, Case, Bodine, JJ. 3.

*For reversal*—The Chief Justice, Donges, Heher, Perskie, Porter, Dear, Wells, Rafferty, Hague, Thompson, JJ. 10.