25 N.J. Super. 254 (1953)
96 A.2d 95
THE COLONIAL LIFE INSURANCE COMPANY OF AMERICA, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
JOHN R. MAZUR AND EDITH MAZUR, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 24, 1953.
*256 Mr. William R. Gannon, for the plaintiff.
Mr. Michael G. Alenick, for the defendants.
SPEAKMAN, J.C.C. (temporarily assigned).
Plaintiff-insurer seeks the judgment of this court rescinding its *257 policy of insurance No. 242028, dated June 5, 1951, in which Patricia M. Mazur, the infant daughter of the defendants, is named as the insured. The defendants-beneficiaries counterclaim for the proceeds of said policy payable by reason of Patricia's death on December 10, 1951.
It is necessary to set forth a chronology of events in order to place in proper perspective the determinative factual issues hereinafter discussed. Patricia was born on March 2, 1951. Dr. Anthony Chase delivered her and for a time continued as the physician for formula regulation. As not infrequently happens with newborn infants, difficulties were encountered; she cried excessively, had diarrhea and did not gain weight properly. Consequently, on the recommendation of Dr. Chase, the mother took the child, on March 28, 1951, to Dr. F.W. Lathrop, a pediatrician, for examination and to see if he could devise a formula suited to the needs of the baby. Dr. Lathrop examined the child on March 28, May 4, June 4 and July 2, 1951. While the father drove the mother and child to Dr. Lathrop on most, if not all of these occasions, he never went in the office, never saw the examinations and at no time consulted with, or was consulted by, Dr. Lathrop.
There is no serious dispute as to generally what statements Dr. Lathrop made to Mrs. Mazur. There is, however, a conflict in regard to the dates on which the statements were made. On this subject Mrs. Mazur answered certain interrogatories served on her as follows:
"27. Did you specifically take your child, Patricia M. Mazur to Dr. F.W. Lathrop of Plainfield, N.J. on March 28, 1951, May 4, 1951, June 4, 1951 and July 2, 1951 for consultation or treatment?
27. Yes.
28. If the answer to the foregoing interrogatory is affirmative as to any of said dates, state the dates of such consultation and examination, and what Dr. Lathrop told you regarding the physical condition of your child on each such consultation, what treatment he prescribed, and what his prognosis was.
28. On March 28, 1951, Dr. Lathrop stated that the baby had a very nervous stomach, but said she was allergic to cow's milk, and he put her on a protein milk formula. He also stated that she had a slight heart murmur, but nothing to worry about, and declared *258 that when the baby would be eight or nine years old or over, and if she would ever have an operation, to let the doctors know that she had a slight heart murmur. On May 4, 1951 the baby was progressing well. Dr. Lathrop took her weight, then put her on a goat's milk formula, and expressed the view that he believed the infant would be all right. In June and July of 1951 Dr. Lathrop conducted a routine checkup. The baby was progressing well, had gained weight, and the prognosis was good."
Dr. Lathrop's recollection was that on March 28, 1951 he made a thorough examination and found that the baby had a heart murmur, was malnourished, had flabby muscles, misshapen ears, dry skin, large fontanels of the soft spots and an umbilical hernia. He said that the heart murmur indicated a possible congenital heart condition and at the time he observed the large frontal fontanels they did not impress him as indicating internal hydrocephalus. The direct cause of death, according to the certificate, was given as congenital heart disease and internal hydrocephalus.
Dr. Lathrop's examination on May 4 and June 4 noted no new conditions. Outwardly the child appeared considerably improved; the fontenals had become smaller, the diarrhea condition had improved and the excessive crying had subsided. From a medical point of view, however, the child's weight gain from March 28 to June 4 was not normal and there was no improvement in the heart condition during this period. His recollection of what he told Mrs. Mazur was that on March 28 they discussed the child's difficult feeding history; that on June 4 he told her that she would have difficulty raising her child (he was referring here merely to nutrition), and he believed that on June 4 he told Mrs. Mazur that this baby had a slight heart murmur but he never told her that the child had a congenital heart condition. Furthermore, he did not expect that the child would die of the conditions that he had observed.
From a consideration of all the evidence in this case it is clear that neither Mr. nor Mrs. Mazur knew before issuance of the policy of the existence of the congenital heart condition. There is a conflict regarding the time when Mrs. Mazur first learned of the heart murmur. Mrs. Mazur *259 recalled that the doctor mentioned it on March 28 but that he never referred to it again. The doctor, basing his recollection partly on his general policy, felt that although he noticed the murmur on March 28 he did not mention it until June 4. In any event, Mrs. Mazur testified that she never told Mr. Mazur of the condition and I am satisfied that Mr. Mazur was not made aware of the heart murmur at any time prior to the issuance of the policy, regardless of whether the policy was delivered to him prior to its date or some time thereafter as urged by the plaintiff. I am equally satisfied that Mr. Mazur was never informed of Dr. Lathrop's statement to Mrs. Mazur that she might have trouble with her baby. As previously indicated, this statement did not refer to the heart condition but merely referred to a matter of nutrition and, as appears later, it makes no difference whether Mr. Mazur was informed of it or not so far as the result here is concerned.
On May 21, 1951 the defendant John R. Mazur applied for insurance on the life of his daughter and answered questions contained in Part B of the application as follows:
"5. Does proposed insured have any deformity or abnormal condition?  No.
6. Has any doctor, to your knowledge, expressed any unfavorable opinion concerning proposed insured's health?  No. * * *
8. What is proposed insured's present state of health?  Good health."
The policy was issued on June 5, 1951.
Patricia Margaret Mazur died on December 10, 1951. The question presented is whether the plaintiff-insurer is entitled to rescission on the basis of equitable fraud due to the falsity in fact of answers to questions 5, 6 and 8 and on the basis of a breach of the continuing warranty grounded in condition 5 of the application for insurance which provides as follows:
"If the full first premium is not paid with this application, the policy shall take effect only if it is issued by the Company, received by me and the full first premium thereon is paid, all while no changes have taken place in the insurability of the proposed insured, and the effective date of the policy shall then be the date shown on its face."
*260 Notwithstanding N.J.S.A. 17:34-15 (d), which provides that "all statements purporting to be made by the insured shall, in the absence of fraud, be deemed representations and not warranties," see Shapiro v. Metropolitan Life Ins. Co., 114 N.J. Eq. 378 (E. & A. 1933), our courts have continued to state that an insurance policy may be declared invalid for equitable fraud, i.e., for misrepresentation of material facts even though innocently made. Metropolitan Life Ins. Co. v. Stern, 124 N.J. Eq. 391 (Ch. 1938); Metropolitan Life Ins. Co. v. Somers, 137 N.J. Eq. 419 (Ch. 1946); Metropolitan Life Ins. Co. v. Tarnowski, 130 N.J. Eq. 1 (E. & A. 1941). See Ettelson v. Metropolitan Life Ins. Co., 164 F.2d 660 (C.C.A. 3 1947).
The doctrine of equitable fraud is founded upon the doctrine of equitable estoppel and has long been recognized and applied as part of the jurisprudence of our State. See DuBois v. Nugent, 69 N.J. Eq. 145 (Ch. 1905). In actions to rescind insurance policies, however, it has not been applied as rigorously as the statement of it suggests. With respect to objective questions contained in an application for insurance, the answers to which must be within the insured's knowledge such as "have you ever visited a doctor?," the rule is applied rather strictly. See Metropolitan Life Ins. Co. v. Somers, supra; Metropolitan Life Ins. Co. v. Tarnowski, supra; Ettelson v. Metropolitan Life Ins. Co., supra. But see Metropolitan Life Ins. Co. v. Urback, 138 N.J. Eq. 108 (E. & A. 1946); Metropolitan Life Ins. Co. v. Sinett, 2 N.J. Super. 506 (Ch. Div. 1949). To subjective questions such as "what is the state of your health?," it is held that the question merely seeks to probe the state of the insured's mind and if the answer is a correct statement of his knowledge and belief it is not regarded as a misrepresentation. Shapiro v. Metropolitan Life Ins. Co., supra; Metropolitan Life Ins. Co. v. Urback, supra; Smith v. Prudential Ins. Co., 83 N.J.L. 719 (E. & A. 1912). See Ettelson v. Metropolitan Life Ins. Co., supra.
The question here involved, the answers to which are asserted to be untrue, are of the subjective rather than of the *261 objective type. Each question seeks to obtain the applicant's opinion or to probe his mind for his knowledge and belief. The evidence demonstrates that to each question the applicant, the insured's father, answered truthfully and to the best of his knowledge and belief. According to the custodian of the records of the Somerset Hospital and two registered nurses, friends of Mrs. Mazur who visited their home during this period, the child appeared normal, or, as the one nurse said, the child appeared to be a normal, healthy baby. So far as the father was concerned, the baby's trouble was a matter of nutrition  she was not feeding properly. It is a matter of common knowledge that a baby's feeding habits are a subject of much concern and discussion by parents but difficulty in feeding is ordinarily "transitory" or "temporary" in nature, such as a common cold or grippe, and not of such materiality to nullify the policy on the ground of equitable fraud. See Metropolitan Life Ins. Co. v. Urback, supra; Metropolitan Life Ins. Co. v. Sinett, supra; see also, Clayton v. General, &c., Assur. Corp., 104 N.J.L. 364 (E. & A. 1928); Batts v. Eastern Mutual Life Corp., 123 N.J.L. 121 (Sup. Ct. 1939); Urback v. Metropolitan Life Ins. Co., 130 N.J.L. 210 (E. & A. 1943). Accordingly, the contract cannot be rescinded even though, unknown to Mr. Mazur, his child was in poor health.
It is next urged that the policy should be rescinded on the ground that there was a breach of the continuing representation set forth in condition 5 of the application previously quoted. As support for this argument plaintiff cites McAuliffe v. Metropolitan Life Ins. Co., 93 N.J.L. 189 (E. & A. 1919); Prahm v. Prudential Ins. Co., 99 N.J.L. 288 (E. & A. 1923); and Levandoski v. Equitable Life Assurance Soc., 103 N.J.L. 643 (E. & A. 1927). This ground is not within the issues raised in either the complaint or pretrial order and need not, therefore, be considered. See Rule 3:16; Schanerman v. Everett and Carbin, Inc., 10 N.J. 215 (1952); Cauco v. Galante, 8 N.J. 233 (1951). But assuming that it has been properly raised, it nevertheless does not aid the plaintiff here.
*262 In the McAuliffe case, supra, the condition was that the insured be "in sound health"; in the Prahm case, supra, it was that the health be as described in the application; in the Levandoski case, supra, it was that the insured be in "good health." In the instant case the vital words are "* * * while no changes have taken place in the insurability of the proposed insured * * *." It will be noted that the import of these words is different from those used in any of the above cited cases; accordingly, the test to be applied is different.
Whether or not the condition precedent was satisfied required a definition of the term "insurability" and the determination of whether or not any changes took place in that regard between the time of the application and the issuance of the policy. "Insurability," when used in conjunction with life insurance, is a term of art, signifying all those physical and moral factors reasonably taken into consideration by life insurance companies in determining coverage or matters affecting the risk. See Rosenbloom v. New Life Ins. Co., 65 F. Supp. 692 (D.C. Mo. 1946). In the instant case the test of insurability was dependent upon the answers to the questions in the application. Therefore, the test of a change in insurability would be whether the applicant would have in any different way responded to his answers on June 5, 1951 as compared with the way he actually answered them on May 21, 1951. The plaintiff has not presented any evidence to show that any change in the infant's insurability did take place during the period in question, either as to the infant's actual condition or as to Mr. Mazur's information thereto. Consequently, no breach of the continuing warranty has been established.
Finally, the plaintiff contends that by retaining the plaintiff's check for refund of premiums paid until after this suit was begun the defendants accepted the check as payment, thereby acquiescing in the plaintiff's election to rescind. Delivery of a check does not ordinarily constitute payment in a legal sense. See Hayes v. Federal Shipbuilding & Dry Dock Co., 5 N.J. Super. 212 (App. Div. 1949). Where, as here, the check was neither cashed nor presented for payment, *263 the defendants cannot be held to have acquiesced in the plaintiff's attempt to cancel the policy.
Notwithstanding its argument to the contrary, plaintiff apparently agrees with the foregoing view for paragraph 8 of the complaint says:
"8. Plaintiff has elected to cancel said policy of insurance because of the fraud and concealment of said John R. Mazur and Edith Mazur aforesaid, and has tendered return of all premiums paid on said policy of insurance, which tender has not yet been accepted. Plaintiff continues its tender of return premiums to the person entitled to the same."
For the foregoing reasons the plaintiff is not entitled to have the policy rescinded.
By their counterclaim the defendants seek to recover the amount of the proceeds of the policy to which they are entitled by reason of the death of their daughter. The face amount of the policy is $3,247. By its terms this is the amount payable except when the "death of the insured occurs before the policy anniversary nearest age three." In such a case  as is the case here  a percentage of the foregoing sum is payable as shown in the following schedule:

-----------------------------------------------------------
 SCHEDULE
-----------------------------------------------------------
Attained Age of Insured Nearest Percentage of Sum
Birthday at Beginning of Policy Insured Payable as
 Year in Which Death Occurs Death Benefit
-----------------------------------------------------------
 0 20%
 1 40%
 2 70%
 3 and over 100%
-----------------------------------------------------------

The insured was three months of age when the policy was issued and was only nine months old when she died. Applying the formula set forth in the foregoing schedule, the defendants are entitled to receive 20% of the face amount of the policy.
Judgment in accordance with the foregoing views may be entered in favor of the defendants on both the complaint and the counterclaim.