53 F.3d 1228
 Vincent FIORETTI, Plaintiff-Counter-Defendant-Appellant-Cross-Appellee,
v.
MASSACHUSETTS GENERAL LIFE INSURANCE COMPANY,
Defendant-Counter-Claimant-Appellee-Cross-Appellant.
 No. 93-5187.
 United States Court of Appeals,
Eleventh Circuit.
 June 7, 1995.
 
 1
 Gerald Lesher, West Palm Beach, FL, for appellant.
 
 
 2
 John W. Thornton, Miami, FL, Mark F. Hughes, Jr., Newark, NJ, for appellee.
 
 
 3
 Appeals from the United States District Court for the Southern District of Florida.
 
 
 4
 Before KRAVITCH and EDMONDSON, Circuit Judges, and EISELE*, Senior District Judge.
 
 EISELE, Senior District Judge:
 
 5
 This is an appeal from a final judgment entered in this diversity action,[1] the subject of which is an insurance coverage dispute. We have jurisdiction pursuant to 28 U.S.C.A. Sec. 1291 (West 1993). Following a bench trial, the district court entered judgment in favor of Massachusetts General Life Insurance Company (MassGen) on all counts of Vincent Fioretti's amended complaint. The court also entered judgment for MassGen on its counterclaims for recision of the disputed life insurance contract. Although we have problems with the legal analysis adopted by the district court, we nevertheless conclude that judgment was, as a matter of law, properly entered in favor of MassGen.[2] As we are permitted to affirm the district court where the judgment entered is correct on any available legal ground, see Parks v. City of Warner Robins, 43 F.3d 609, 613 (11th Cir.1995); SEC v. Southwest Coal & Energy Co., 624 F.2d 1312, 1317 (5th Cir.1980),[3] we AFFIRM.
 
 I.
 
 6
 With one crucial exception (which will be discussed later in this opinion), the basic facts underlying this dispute are largely undisputed.[4]
 
 
 7
 On November 10, 1986, Anthony Fioretti applied for $100,000 of life insurance with the Columbian Mutual Life Insurance Company (Columbian Mutual). This application, which was taken in New York City, indicated that Anthony Fioretti had not, within five years of the application date, experienced any serious medical problems. Nevertheless, he was required to submit to a blood test as a condition of his application. In January, 1987, Columbian Mutual was informed that Anthony Fioretti had tested positive for the Human Immunodeficiency Virus (HIV). Not surprisingly, Columbian Mutual rejected his application. Later in January, 1987, the results of the Columbian Mutual blood test were sent, at Anthony Fioretti's request, to Dr. Howard Siegel, a New York physician (and, presumably, one of Anthony Fioretti's treating doctors).
 
 
 8
 Undaunted by his experience with Columbian Mutual, Anthony Fioretti, on February 10, 1987, applied for $1,947,111 of life insurance with MassGen. However, on his MassGen application Anthony Fioretti represented his name as "C. Tony Fioretti" (his real name was Anthony C. Fioretti) and his date of birth as "3-6-47" (his real date of birth was September 6, 1948). He appears, however, to have correctly listed his Social Security Number as lmv-ie-efgca class="footnote" href="#fn5" id="fn5_ref">5 (the Social Security Number listed on his Columbian Mutual application was "XXX-XX-XXXX").[6] Additionally, Anthony Fioretti indicated that he had not "within the past 3 years consulted a physician for an examination, blood or other medical tests, [or] treatment of any disease, condition, or other physical disorder." Anthony Fioretti's MassGen application stated that it would be effective as of August 30, 1986, and that the Shields & Warendorff Florist, Inc. Pension Plan would be the owner of this policy.[7] The application stated that Vincent Fioretti (Anthony Fioretti's brother) would be the beneficiary of this policy, and listed Anthony Fioretti's place of residence as both New York City and Tamarac, Florida.
 
 
 9
 Anthony Fioretti's MassGen application indicated that it was taken by Stuart Kirsner, a broker associated with the New York-based insurance agency Kirsner, Stern & Slavutin, Inc.[8] Although Mr. Kirsner was not licensed to sell insurance in Florida,[9] the application indicated that it was completed in Tamarac, Florida. As a pre-condition for its approval of this application, MassGen required Anthony Fioretti to undergo a blood test for the HIV virus. Anthony Fioretti agreed, but because he knew that he was HIV-positive, in June, 1987 he arranged for an imposter's blood to be tested under his name at the Spring Medical Group in New York City.[10] This test indicated that the blood submitted for testing, namely that of the imposter, had reacted negatively for the HIV virus. Despite this favorable result, MassGen ultimately refused to approve Anthony Fioretti's application, because Mr. Kirsner was not licensed to do business in Florida and the application indicated that it had been completed in that state.
 
 
 10
 Following this rejection, Anthony Fioretti submitted a second life insurance application to MassGen on September 8, 1987. This application indicated that it was taken by Ina Stern,[11] another broker associated with Kirsner, Stern & Slavutin. The terms of this second MassGen application (e.g., the amount of insurance, the policy's effective date, the beneficiary, etc.) were substantially similar to the original application, as were the misrepresentations concerning Anthony Fioretti's identifying information and medical history. However, in contrast to the former MassGen application, the latter indicated that it was completed in Newark, New Jersey,[12] a state in which Ms. Stern was licensed to sell insurance.[13]
 
 
 11
 Because this second application was submitted shortly after the results of the above-described blood test were made available, MassGen did not require Anthony Fioretti to undergo a separate HIV test in connection with this application. Instead, after a review by its Colorado office, MassGen advised that it would approve this application, provided that, in lieu of a second HIV test, Anthony Fioretti would be required to execute a Statement of Good Health and Insurability (Statement of Good Health), which he did. This Statement of Good Health, which was executed in New Jersey on September 25, 1987,[14] represented that Anthony Fioretti was "in good health," that he had "not made an application for insurance which ha[d] been declined, postponed, or modified," and that he had "not consulted or been examined by a physician or practitioner" prior to executing the Statement of Good Health. However, at the time he completed this Statement of Good Health, Anthony Fioretti knew: (1) that he was HIV-positive; (2) that he had previously been declined life insurance by another carrier (Columbian Mutual); and (3) that he had previously consulted with at least two doctors concerning his HIV status. In short, every representation made by Anthony Fioretti in the Statement of Good Health was false.[15]
 
 
 12
 After completing the Statement of Good Health (and thereby securing insurance coverage), Anthony Fioretti timely paid all of the premiums required under the policy. Shortly thereafter, on December 14, 1987 Anthony Fioretti applied to MassGen for a "Waiver of Premium," which would have relieved him from having to pay any premiums during any period of total disability. Although Anthony Fioretti stated on this application that, "[t]o the best of [his] knowledge and belief," he did not "have any physical disease or disorder," he was nevertheless required to undergo a second HIV test in connection with this application. In April, 1988, he again managed to have an imposter's blood submitted for testing, and once again this blood tested negative for the HIV virus. On the strength of this test result and Anthony Fioretti's execution of a second Statement of Good Health, MassGen approved Anthony Fioretti's Waiver of Premium. This waiver never went into effect, however, because Anthony Fioretti declined to pay the necessary premium.
 
 
 13
 On February 28, 1989, Anthony Fioretti died while domiciled in Florida. The cause of death listed on his death certificate was Acquired Immune Deficiency Syndrome (AIDS).[16] In April, 1989, Vincent Fioretti filed a claim with MassGen as the beneficiary of the death benefits under Anthony Fioretti's life insurance policy. In December, 1989, MassGen denied Vincent Fioretti's claim and tendered the premiums paid under the policy, but this tender was rejected by Vincent Fioretti's counsel. Later that month, MassGen commenced an action in the Superior Court of New Jersey seeking rescission of this policy, but this action was dismissed on June 1, 1990 for lack of personal jurisdiction over Vincent Fioretti. Soon thereafter, Vincent Fioretti commenced an action in the Circuit Court of Florida seeking to recover the death benefits under the policy. On July 5, 1990, MassGen removed this action to the district court and filed its counterclaims seeking rescission.
 
 
 14
 In support of its claims for rescission, MassGen argued that since Anthony Fioretti had committed fraud in securing his life insurance policy, viz, by misrepresenting his HIV-positive status and by using an imposter's blood to avoid detection, it should be relieved of its obligations under the policy. Vincent Fioretti, however, argued that under the policy's incontestability clause, MassGen was precluded from disclaiming coverage for any reason--including fraud--other than non-payment of premiums. The relevant clause provides as follows:
 
 INCONTESTABILITY
 
 15
 This policy will be incontestable after it has been in force during the lifetime of the insured for 2 years from the date of issue except for non-payment of premiums.
 
 
 16
 Vincent Fioretti further argued that since the policy stated that its effective date was August 30, 1986, the two-year period of contestability had lapsed prior to Anthony Fioretti's death on February 28, 1989,[17] and that accordingly he was entitled to the policy's death benefits. The district court agreed with MassGen and concluded that an "imposter defense" exists which removes the bar on coverage disputes otherwise imposed by an incontestability clause. Accordingly, the district court entered judgment in favor of MassGen and rescinded the policy.
 
 II.
 
 17
 There is little doubt that this dispute presents, on its face, a conflict-of-laws problem, namely whether the governing law is to be supplied by New York, New Jersey, or Florida.[18] The district court recognized this problem, but ultimately concluded that it "need not resolve the choice of law question ..., because [the court found] that neither New York, New Jersey, nor Florida law bars proof of imposture [as a defense in an insurance coverage action] despite the existence of an incontestability clause."[19] Accordingly, the district court found it unnecessary to undertake any formal conflict-of-laws analysis in order to determine the controlling law. Instead, the district court appears to have followed a conflict-of-laws principle that has been applied to this species of "false conflict" cases.[20] Simply stated, this principle is that, when the laws of the competing states are substantially similar, the court should avoid the conflicts question and simply decide the issue under the law of each of the interested states.[21] See Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378, 1387-88 & n. 17 (11th Cir.1988); accord Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 813 (3d Cir.1994). We review conflict-of-laws issues de novo. Shapiro v. Associated Int'l Ins. Co., 899 F.2d 1116, 1118 (11th Cir.1990); American Family Life Assurance Co. v. United States Fire Co., 885 F.2d 826, 830 (11th Cir.1989).
 
 
 18
 In order to determine whether the district court answered the conflict-of-laws question properly, it appears that we must first decide whether the court correctly interpreted the law of New York, New Jersey and Florida on the controlling legal question, i.e., whether these states recognize the "imposter defense" in life insurance coverage actions involving an incontestability clause.[22] We review the district court's interpretation of state law de novo. Salve Regina College v. Russell, 499 U.S. 225, 231-33, 111 S.Ct. 1217, 1221-22, 113 L.Ed.2d 190 (1991); Insurance Co. of N. Am. v. Lexow, 937 F.2d 569, 517 (11th Cir.1991).
 
 
 19
 As the district court below correctly recognized, neither the Supreme Court of Florida, the Supreme Court of New Jersey, nor the New York Court of Appeals have ever addressed the question whether their respective jurisdictions recognize the "imposter defense." Indeed, there is presently not a single reported decision from any state court in these jurisdictions addressing this precise legal issue.[23] This fact alone counsels against the district court's treatment of the conflict-of-laws issue presented by this case. In the total absence of any relevant precedent, it becomes necessary to attempt to prognosticate how these state courts would resolve the "imposter defense" issue. See Towne Realty, Inc. v. Safeco Ins. Co. of Am., 854 F.2d 1264, 1269 n. 5 (11th Cir.1988); Wammock v. Celotex Corp., 835 F.2d 818, 820 (11th Cir.1988). However, without any such precedent it is, quite simply, impossible to say with certainty what the law of these states actually is, not to mention whether these states' laws are identical. Accordingly, we choose not to follow the analytical approach adopted by the district court. Rather, in a case such as this we believe that the more prudent course is for the court to undertake a traditional conflict-of-laws analysis, determine the controlling law, and then attempt to answer the relevant legal question under the law of that state. See Day & Zimmerman, Inc. v. Challoner, supra, 423 U.S. at 4-5, 96 S.Ct. at 168. This approach reduces the likelihood that an error of state law will infect the proceeding, since the court will only be required to interpret the unsettled law of one jurisdiction. Cf. Delahanty v. Hinckley, 845 F.2d 1069, 1070 (D.C.Cir.1988) (a federal court sitting in diversity should refrain, as much as possible, from speculating on unsettled questions of state law); Melville v. American Home Assurance Co., 584 F.2d 1306, 1311 n. 7 (3d Cir.1978) (same).
 
 
 20
 Since this is a diversity action, we are required to apply the substantive law of the forum state, namely Florida, Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including its conflict-of-laws rules. Klaxon Co. v. Stentor Elect. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); Bryan v. Hall Chem. Co., 993 F.2d 831, 834 (11th Cir.1993). When resolving conflict-of-laws issues in contract actions, the Florida Supreme Court has unambiguously indicated its intent to reject the more modern (and flexible) "significant contacts" analysis of the second Restatement of the law of conflicts,[24] or the "center of gravity" analysis first pioneered by the New York Court of Appeals,[25] choosing instead to adhere to the traditional rule of lex loci contractus. Goodman v. Olsen, 305 So.2d 753, 755 (Fla.1974); accord Walling v. Christian & Craft Grocery Co., 41 Fla. 479, 27 So. 46, 49 (1899). The doctrine of lex loci contractus directs that, in the absence of a contractual provision specifying the governing law,[26] a contract (other than one for the performance of services) is governed by the law of the state in which the contract is made, i.e., where the last act necessary to complete the contract is done. Equitable Life Assurance Soc'y of the U.S.A. v. McRee, 75 Fla. 257, 78 So. 22, 24 (1918); Lacy v. Force V Corp., 403 So.2d 1050, 1056 (Fla.Dist.Ct.App.1981); Jemco, Inc. v. United Parcel Serv., Inc., 400 So.2d 499, 500 (Fla.Dist.Ct.App.1981), review denied, 412 So.2d 466 (Fla.1982); see also Robert A. Leflar, Luther L. McDougal, III & Robert L. Felix, American Conflicts Law Sec. 145 at p. 145-46 (4th ed. 1986). The Florida Supreme Court has not recently had occasion to apply this doctrine in the context of a life insurance dispute. However, the Florida court has expressly held that the principle of lex loci contractus applies to automobile insurance contracts, Lumbermens Mut. Casualty Co. v. August, 530 So.2d 293, 295 (Fla.1988); Sturiano v. Brooks, 523 So.2d 1126, 1129-30 (Fla.1988), concluding that because ours is a migratory society, Florida's public policy favors a rigid conflict-of-laws rule in such disputes, and counsels against a more flexible rule that could possibly "allow one party to modify the contract simply by moving to another state," since such a rule "would substantially restrict the power to enter into valid, binding, and stable contracts."[27] Sturiano v. Brooks, supra, 523 So.2d at 1130. Since this rationale applies with equal (if not greater) force to contracts insuring the life of an automobile's driver (or passenger) as it does to contracts insuring the automobile itself, we have little doubt that, under Florida law, the lex loci contractus doctrine also applies to the life insurance policy at issue in this dispute.[28] Confederation Life Ass'n v. Vega Y Arminan, 207 So.2d 33, 36-37 (Fla.Dist.Ct.App.), aff'd and cert. discharged, 211 So.2d 169 (Fla.), cert. denied, 393 U.S. 980, 89 S.Ct. 450, 21 L.Ed.2d 441 (1968); see also Santovenia v. Confederation Life Ass'n, 460 F.2d 805, 809-10 (5th Cir.1972) (applying Florida conflicts law).
 
 
 21
 In this case, MassGen agreed to underwrite Anthony Fioretti's life insurance policy, contingent only upon his execution of the Statement of Good Health. Since MassGen expressly conditioned its approval of Anthony Fioretti's application on this one event (as opposed, to say, his tendering of the first required premium),[29] we agree with the parties' mutual position, as expressed during oral argument, that the execution of the Statement of Good Health was the last event necessary to complete this contract. See Equitable Life Assurance Soc'y of the U.S.A. v. McRee, supra, 78 So. at 24. Therefore, since this Statement of Good Health was executed in New Jersey, we conclude that, under Florida's conflict-of-laws rules, New Jersey's substantive insurance law governs this dispute.[30]
 
 III.
 
 22
 Under New Jersey law, an insurer is required to include an incontestability clause in any policy of life insurance. N.J.Stat.Ann. Sec. 17B:25-4 (West 1985) provides:
 
 
 23
 There shall be a provision that the policy (exclusive of provisions of the policy or any contract supplemental thereto relating to disability benefits or to additional benefits in event of death by accident or accidental means or in event of dismemberment or loss of sight) shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue.
 
 
 24
 As Vincent Fioretti correctly points out, the incontestability clauses contemplated by such statutes are generally construed as statutes of limitations that, upon expiration, preclude all coverage defenses, including fraud. See generally 18 George J. Couch, Ronald A. Anderson & Mark S. Rhodes, Couch Cyclopedia of Insurance Law Secs. 72:70 to 72:76 (2d ed. rev. ed. 1983); 1A John Alan Appleman & Jean Appleman, Insurance Law and Practice Secs. 332 to 334 (1981). This principle found support in some early New Jersey cases. See Prudential Ins. Co. of Am. v. Connallon, 154 A. 729, 730 (N.J.Ct.Err. & App.1931); but see Metropolitan Life Ins. Co. v. Tarnowski, 20 A.2d 421, 423-24 (N.J.Ct.Err. & App.1941). However, in a recent decision involving the incontestability clause of a life insurance policy governed by Sec. 17B:25-4, the New Jersey Supreme Court explicitly stated that this statute does not prevent a life insurer from denying coverage when its insured has committed fraud in securing coverage. The New Jersey court explained:
 
 
 25
 Even after the expiration of the contestability period, an insurer may deny a claim if the insured committed fraud in the policy application. Paul Revere Life Ins. Co. v. Haas, 137 N.J. 190, 644 A.2d 1098 (1994). To rescind a policy, an insurer need not show that the insured actually intended to deceive. Massachusetts Mut. Life Ins. Co. v. Manzo, 122 N.J. 104, 114, 584 A.2d 190 (1991). Even an innocent misrepresentation can constitute equitable fraud justifying rescission. Metropolitan Life Ins. Co. v. Tarnowski, 130 N.J.Eq. 1, 3-4, 20 A.2d 421 (E. & A. 1941).
 
 
 26
 Ledley v. William Penn Life Ins. Co., 138 N.J. 627, 651 A.2d 92, 95 (1995).[31]
 
 
 27
 Since New Jersey law permits an insurer to rescind even when its insured has committed an innocent misrepresentation, it seems obvious that New Jersey law would also recognize the "imposter defense," as the fraud in such a case is far more egregious. In any event, we need not resolve this question. It is undisputed that Anthony Fioretti knowingly misrepresented his HIV-positive status, as well as other health-related information, in both the final policy application and the Statement of Good Health. Thus, under New Jersey law, these misrepresentations, which were undoubtably material to the underwriting process, plainly constitute a sufficient basis to support MassGen's denial of Vincent Fioretti's claim and its rescission of the disputed policy, even if it is assumed that the contestability period expired prior to Anthony Fioretti's death. See id. at 651 A.2d at 95-97; see also Paul Revere Life Ins. Co. v. Haas, 137 N.J. 190, 644 A.2d 1098, 1106-08 (1994) (even after lapse of contestability period, a health insurer may deny coverage based on insured's nondisclosure of a serious illness in his insurance application); Johnson v. Metropolitan Life Ins. Co., 53 N.J. 423, 251 A.2d 257, 263-67 (1969) (rescission authorized when insured knowingly misrepresents material health information to health insurer); Urback v. Metropolitan Life Ins. Co., 32 A.2d 337, 338-39 (N.J.Ct.Err. & App.1943) (same when misrepresentations made to life insurer). Accordingly, the judgment of the district court is
 
 
 28
 AFFIRMED.
 
 
 
 *
 Honorable Garnett Thomas Eisele, Senior U.S. District Judge for the District of Arkansas, sitting by designation
 
 
 [1]
 Plaintiff Vincent Fioretti is a citizen of Florida. Defendant Massachusetts General Life Insurance Company is a Massachusetts corporation, having its principal place of business in Colorado
 
 
 [2]
 Given our conclusion that judgment was properly entered in favor of MassGen, we have no need to decide the primary issue raised by MassGen's cross-appeal, that being whether, in light of the "preemption clause" of the Employee Retirement Income Security Act (ERISA), 29 U.S.C.A. Sec. 1144(a) (West 1985), federal common law should be held to govern this dispute. Nevertheless, we note that MassGen's preemption argument is tenuous at best. Assuming that the disputed insurance policy was provided under an "employee welfare benefit plan," and hence subject to ERISA, see 29 U.S.C.A. Sec. 1002(1) (West 1985), the ERISA "savings clause" expressly provides that, with one exception not presently relevant, the preemption clause "shall [not] be construed to exempt or relieve any person from any law of any State which regulates insurance." 29 U.S.C.A. Sec. 1144(b)(2)(A) (West 1985). The broad language of the savings clause makes it difficult to define the scope of the equally broad preemption clause. See Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 739-46, 105 S.Ct. 2380, 2389-92, 85 L.Ed.2d 728 (1985); Smith v. Jefferson Pilot Life Ins. Co., 14 F.3d 562, 569-71 (11th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 57, 130 L.Ed.2d 15 (1994). Nevertheless, it seems relatively clear that the central legal issue in this case, namely the effect (if any) of the disputed insurance policy's incontestability clause, involves provisions of state law designed to directly regulate the insurance industry. As such, these questions of state law fall within the scope of the ERISA savings clause and are not preempted. See FMC Corp. v. Holliday, 498 U.S. 52, 58-62, 111 S.Ct. 403, 407-10, 112 L.Ed.2d 356 (1990); cf. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47-57, 107 S.Ct. 1549, 1552-58, 95 L.Ed.2d 39 (1987). Moreover, since the benefits of this ERISA "plan" were not payable from a self-insurance fund, but rather from an insurance policy underwritten by a third-party insurer, it is almost certain that this insurance policy remained subject to state insurance law. See Metropolitan Life Ins. Co. v. Massachusetts, supra, 471 U.S. at 741-47, 105 S.Ct. at 2390-93; cf. Mullenix v. Aetna Life & Casualty Ins. Co., 912 F.2d 1406, 1409-13 (11th Cir.1990)
 
 
 [3]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the prior Fifth Circuit decided prior to October 1, 1981
 
 
 [4]
 Our recitation of this dispute's factual background is taken from the district court's written findings of fact. We have independently reviewed the record and are satisfied that the district court's factual findings are supported by substantial credible evidence and are not clearly erroneous. See Fed.R.Civ.P. 52(a), Pullman-Standard v. Swint, 456 U.S. 273, 287-88, 102 S.Ct. 1781, 1789-90, 72 L.Ed.2d 66 (1982); Newell v. Prudential Ins. Co. of Am., 904 F.2d 644, 649 (11th Cir.1990)
 
 
 [5]
 This is also the Social Security Number listed on Anthony Fioretti's death certificate
 
 
 [6]
 These misrepresentations are irrelevant for purposes of this appeal. However, it appears that Anthony Fioretti made these misrepresentations in order to make it difficult for MassGen to discover that he had recently been denied life insurance by Columbian Mutual
 
 
 [7]
 Shields & Warendorff Florist, Inc. was a New York-based corporation (a floral shop) that was then wholly owned by Anthony Fioretti
 
 
 [8]
 Actually, this application was completed and signed "Stuart Kirsner" by Suzanne Kaplon-Harmon, a clerk employed in Kirsner, Stern & Slavutin's New York office. Ms. Kaplon-Harmon had the authority to do so
 
 
 [9]
 MassGen, by contrast, was authorized to do business in Florida. However, MassGen was not licensed to do business in Mr. Kirsner's home state of New York
 
 
 [10]
 During his summation, and again during oral argument, plaintiff's counsel conceded that Anthony Fioretti had arranged for an imposter's blood to be tested in connection with his MassGen application. Given this concession, the district court found it unnecessary to determine whether a third person actually showed up for testing, or whether Anthony Fioretti somehow substituted the third person's blood after presenting himself for testing. We likewise find it unnecessary to answer this question
 
 
 [11]
 As with the prior MassGen application, this application was actually completed and signed "Ina Stern" by Ms. Kaplon-Harmon. Ms. Kaplon-Harmon had the authority to do so
 
 
 [12]
 In addition to this representation, when this application was sent to MassGen's underwriting department it was accompanied by a September 11, 1987 handwritten letter from Ms. Kaplon-Harmon, which stated that "enclosed is the new application signed in N.J."
 
 
 [13]
 Although MassGen was authorized to do business in New Jersey, it appears that the policy form sold to Anthony Fioretti (a "Lifetrend III" policy) had not then been approved for sale in either New Jersey or New York. This policy form had, by contrast, been approved for sale in Florida
 
 
 [14]
 Vincent Fioretti vigorously argues that the Statement of Good Health (as well as the second MassGen application) was not, in fact, executed in New Jersey (though tellingly, he does not direct us to any evidence suggesting an alternate situs). The district court squarely rejected this claim, finding that "the preponderance of the evidence does not support Plaintiff's contention." Indeed, the district court went even further and expressly concluded that "New Jersey was the location of the last act necessary to complete the contract--as evidenced by the designation of 'NJ' on the Statement of Good Health and the lack of any evidence to contravene this inference." We are satisfied that this factual finding is adequately supported by the record
 Apart from the Statement of Good Health, the only evidence presented to the district court on this factual question was the deposition testimony of Ms. Kaplon-Harmon, the person who actually completed the Statement of Good Health on behalf of Ms. Stern. Unfortunately, this testimony was not probative on this question, as Ms. Kaplon-Harmon testified that she could not remember where this document was signed. However, the Statement of Good Health itself contains a prior statement by Ms. Kaplon-Harmon (the "NJ" notation), see Fed.R.Evid. 801(a)(1); United States v. Day, 591 F.2d 861, 883 (D.C.Cir.1978), which indicates that in 1987 she believed that this document was executed in New Jersey. It was plainly within the district court's discretion to conclude that her recollection in 1987 was more accurate than that manifested at her 1990 deposition. And although her prior statement is undoubtably hearsay, Fed.R.Evid. 801(c), NLRB v. First Termite Control Co., 646 F.2d 424, 425-26 (9th Cir.1981), since Ms. Kaplon-Harmon testified that she could not recall where the Statement of Good Health was signed, her prior statement serves as perfectly competent evidence as to the situs of the Statement of Good Health's execution, namely New Jersey. Fed.R.Evid. 803(5); see White v. Mississippi State Oil & Gas Bd., 650 F.2d 540, 543 (5th Cir. Unit A 1981). Moreover, since there is absolutely no evidence in the record to suggest that this document was signed anywhere other than New Jersey, we cannot conclude that the district court's factual finding on this issue is clearly erroneous.
 
 
 [15]
 Plaintiff's counsel conceded this point at oral argument, stating that Anthony Fioretti had "lied" and provided "false" information to MassGen in order to secure insurance
 
 
 [16]
 HIV is the retrovirus that is generally believed to cause AIDS. Scientists believe that HIV invades and replicates in the host's cells, most notably the T-lymphocytes (a type of white blood cell that is essential to the proper functioning of the human immune system). The resulting damage to the immune system leaves the infected individual increasingly susceptible to a variety of diseases, such as Kaposi's sarcoma (a skin disease with which Anthony Fioretti was afflicted as early as March, 1987). AIDS is fatal, and there is presently no cure. See generally Jay A. Levy, Human Immunodeficiency Viruses and the Pathogenesis of AIDS, 261 JAMA 2997 (1989); United States Public Health Service, Surgeon General's Report on Acquired Immune Deficiency Syndrome (1987)
 
 
 [17]
 MassGen argues that there is a question whether the contestability period had actually lapsed at the time of Anthony Fioretti's death. Specifically, MassGen argues that the contestability period does not run from the policy's stated date of issue (August 30, 1986), but rather from the first date of coverage (September 25, 1987), i.e., the date upon which the policy began to be "in force." However, since the policy defines the term "date of issue" by reference to the "date of issue shown on [the] Policy Data Page" (August 30, 1986), and as the contestability period is defined as "2 years from the date of issue," MassGen's construction seems strained. See Mutual Life Ins. Co. of N.Y. v. Hurni Packing Co., 263 U.S. 167, 174-78, 44 S.Ct. 90, 90-92, 68 L.Ed. 235 (1923); but cf. 1A John Alan Appleman & Jean Appleman, Insurance Law and Practice Sec. 312 (1981). This issue was not, however, addressed by the district court, and, given our ultimate resolution of this case, we likewise decline to resolve this question. We also find it unnecessary to decide whether Anthony Fioretti's continuing acts of fraud operated to toll the running of the contestability period. See, e.g., Spear v. Guardian Life Ins. Co. of Am., 112 A.D.2d 904, 493 N.Y.S.2d 322, 325 (1985), appeal dismissed, 67 N.Y.2d 647, 499 N.Y.S.2d 1030, 490 N.E.2d 558, and appeal dismissed, 67 N.Y.2d 605, 501 N.Y.S.2d 1023, 492 N.E.2d 794 (1986)
 
 
 [18]
 The parties have apparently conceded--and we agree--that there are no other viable candidates (e.g., Colorado) to be considered in this conflict-of-laws problem
 
 
 [19]
 This represents a marked departure from the district court's prior resolution of this question. For example, in its November 15, 1990 memorandum opinion denying, on a motion for reconsideration, the first of Vincent Fioretti's many motions for summary judgment, the district court concluded that "these states' law differ as to the controlling legal issues in this action."
 
 
 [20]
 See Hurtado v. Superior Court of Sacramento County, 11 Cal.3d 574, 114 Cal.Rptr. 106, 109, 522 P.2d 666, 669 (1974) ("The fact that two [or more] states are involved does not in itself indicate that there is a 'conflict of laws' or 'choice of law' problem. There is obviously no problem where the laws of the two states are identical."); see also Eugene F. Scoles & Peter Hay, Conflict of Laws Sec. 2.6 at p. 17 (1984) ("A 'false conflict' exists when the potentially applicable laws do not differ...."); cf. Restatement (Second) of Conflict of Laws Sec. 1 cmt. b (1971)
 
 
 [21]
 From a strictly analytical perspective, it is somewhat questionable, given the Klaxon doctrine, whether it is appropriate for a federal court, sitting in diversity, to adopt such an approach when confronted with this species of "false conflict" cases (unless, of course, the forum state's courts would do likewise). See Day & Zimmerman, Inc. v. Challoner, 423 U.S. 3, 4-5, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975) (per curiam) ("[T]he conflict-of-laws rules to be applied by a federal court ... must conform to those prevailing in the [forum's] state courts."). However, when it is plainly clear that there is no difference in the substantive law of the competing states, this mode of analysis may, arguably, be resorted to, as it will ultimately yield the correct result. See Robert A. Leflar, Luther L. McDougal, III & Robert L. Felix, American Conflicts Law Sec. 92 at p. 272-73 (4th ed. 1986). Alternatively, the court could simply apply the law of the forum state, another method of deciding this brand of "false conflicts" cases. E.g., Stamp v. Department of Labor & Indus., 122 Wash.2d 536, 859 P.2d 597, 600 (1993); Lutz v. Demars, 559 N.E.2d 1194, 1196 n. 1 (Ind.Ct.App.1990); see also Forsyth v. Cessna Aircraft Co., 520 F.2d 608, 611-12 (9th Cir.1975) (applying Oregon law). Both approaches will produce the correct result; however, the latter enjoys the additional virtues of being more streamlined and less time-consuming, since only one body of law need be employed to resolve the dispute. See McNall v. Tatham, 676 F.Supp. 987, 995 n. 10 (C.D.Cal.1987)
 
 
 [22]
 This "imposter defense" was first articulated in the case of Maslin v. Columbian Nat'l Life Ins. Co., 3 F.Supp. 368 (S.D.N.Y.1932). That case involved a life insurance policy that was procured after an imposter had posed as the insured during a medical exam required by the insurer. Because this fraud was not discovered until after the contestability period had lapsed, the district court concluded, as a matter of New York insurance law, that the policy's incontestability clause barred the insurer from disclaiming coverage. Id. at 369. However, the district court concluded that principles of New York contract law offered a different defense to the insurer. Specifically, the district court held that when an imposter is used to secure an insurance policy, there can be no "meeting of the minds" between the insurer and the insured on an essential element of the contract, namely the identity of the insured. Hence, the insurance contract was held never to have been binding or enforceable vis-a-vis the named insured (though the court commented that the imposter might have been able to enforce the policy). Id. at 369-71
 
 
 [23]
 There are, however, federal decisions addressing this question. In Strawbridge v. New York Life Ins. Co., 504 F.Supp. 824, 830 (D.N.J.1980), a federal district court held that New Jersey law recognizes the "imposter defense." And while Maslin v. Columbian Nat'l Life Ins. Co., supra, was a case that pre-dated Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this decision relied almost exclusively on New York case law, and as such we believe that this case can be viewed as an expression of New York common law. While these decisions are informative, they cannot, however, be viewed as representing a definitive answer to these questions of state law. See Spencer Boat Co. v. Liutermoza, 498 F.2d 332, 333 n. 3 (5th Cir.1974)
 We also are cognizant of our decision in Bankers Security Life Ins. Society v. Kane, 885 F.2d 820, 822 (11th Cir.1989), in which we expressed our opinion that Florida law does not appear to recognize the "imposter defense." The district court, however, chose not to adopt this construction of Florida law, concluding that this portion of our opinion was "properly understood as dicta." Given our ultimate resolution of this dispute, we need not decide whether the district court properly interpreted the scope of our opinion in Kane.
 
 
 [24]
 See Restatement (Second) of Conflict of Laws Sec. 188 (1971); see also id. Sec. 192
 
 
 [25]
 See Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954)
 
 
 [26]
 It is undisputed that the insurance policy in this case contained no such clause
 
 
 [27]
 Obviously, the basic assumption behind the lex loci contractus doctrine is that when a contract is executed in a particular state, the parties can be assumed to have intended to have that state's laws govern their contractual relationship. See Sturiano v. Brooks, supra, 523 So.2d at 1129; Milliken v. Pratt, 125 Mass. 374, 382-83 (1878); cf. Restatement of Conflict of Laws Sec. 332 cmt. c (1934)
 
 
 [28]
 In Shapiro v. Associated Int'l Ins. Co., supra, we declined to extend Florida's lex loci contractus rule to contracts insuring real property, concluding that the migration rationale of Sturiano does not apply to contracts insuring real (i.e., immovable) property. 899 F.2d at 1119-21. This distinction clearly has little, if any, application in the present case. In any event, we are "bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." Silverberg v. Paine, Webber, Jackson & Curtis, Inc., 710 F.2d 678, 690 (11th Cir.1983)
 
 
 [29]
 Although the record indicates that Anthony Fioretti paid all his premiums in accordance with the timetable established by the policy, it does not indicate when (or where) these payments were made
 
 
 [30]
 The district court likewise concluded that "New Jersey would supply the rule of decision under the lex loci contractus approach."
 
 
 [31]
 Since the contestability period had not lapsed in the Ledley case, this portion of the court's opinion is technically dicta. We nevertheless view the New Jersey court's discussion as an informed (and accurate) exposition of New Jersey law. See Towne Realty, Inc. v. Safeco Ins. Co. of Am., supra, 854 F.2d at 1269 n. 5