**PEZOLD AIR CHARTERS, a Delaware Corporation, Plaintiff/Counterclaim Defendant,**

v.

**PHOENIX CORPORATION, a Mississippi Corporation, Defendant/Counterclaim Plaintiff,**

v.

**Jack Pezold, Counterclaim Defendant.**

No. 699CV552–0RL–18A.

United States District Court, M.D. Florida, Orlando Division.

May 4, 2000.

Brian W. Bennett, Kay, Gronek & Latham, LLP, Orlando, FL, for Pezold Air Charters, LLC, a Delaware Limited Liability Company, plaintiffs.

Donald Ross Andersen, Smith, Howard & Ajax, Atlanta, GA, David C. Schwartz, David C. Schwartz, P.A., Orlando, for Phoenix Corporation, a Mississippi corporation, defendants.

## ORDER

G. KENDALL SHARP, Senior District Judge.

Pezold Air Charters (PAC) sues Phoenix Corporation for breach of a contract to upgrade PAC's Beechcraft King Air aircraft with new engines. Phoenix countersues against PAC and its owner, Jack Pezold, claiming that they, together with several others, conspired (1) to misrepresent the status of Phoenix's upgrade plan to the Federal Aviation Administration (FAA) so that the FAA would revoke Phoenix's authority to perform upgrades, (2) to use Phoenix's trade secrets to create a new competing method for performing upgrades, and (3) to undermine Phoenix's business by publishing false and misleading information on the internet about the Phoenix upgrade plan and Phoenix's principals.

Several motions are presently before the Court including, among others, Phoenix's motion to dismiss PAC's claims (Doc. 132); PAC and Mr. Pezold's motion for summary judgment on Phoenix's counterclaims (Doc. 33); and Phoenix's motion to voluntarily dismiss its counterclaims (Doc. 133). After reviewing the record and the applicable law, the Court finds that PAC's claims should not be dismissed but that Phoenix's counterclaims cannot survive summary judgment.

## I. Background

### A. The Parties

Jack Pezold owned an air chartering business known as Pezold Air Charters, L.L.C. (PAC). (See Dep. Pezold at 9, Doc. 37.) Phoenix Corporation was in the business of designing and installing aircraft engine conversion modifications to improve the performance of older aircraft.. (See Decl. Bailey ¶¶ 10–11, Doc. 104.) In particular, William Gordon Bailey, a principal of Phoenix, helped Phoenix develop a plan for upgrading older Beechcraft King Air airplanes by replacing the aircraft's Pratt & Whitney PT6 engines

with modern Walter 601E–11 turboprop engines. (*See id.* ¶¶ 6–10.) On May 16, 1997, the FAA approved the plan by issuing to Phoenix Supplemental Type Certificate SA013366AT (Phoenix STC). (*See id.* ¶ 10.)

### B. The Agreement with Phoenix

In early August 1997, Mr. Pezold signed an agreement with Phoenix whereby Phoenix promised to upgrade PAC's older Beechcraft King Air C90 N682KA aircraft using the Phoenix STC. (*See* Agreement, Doc. 16, Ex. A; Dep. Pezold at 10–11, Doc. 37.) Phoenix pledged to complete the work by September 3, 1997. (*See* Agreement, Doc. 16, Ex. A.)

The conversion cost $340,000. (*See* Aff. Pezold ¶ 3, Doc. 36.) Mr. Pezold contends that he agreed (1) to pay $170,000 up front with $20,000 due upon acceptance of the converted aircraft and (2) to allow Phoenix to sell the engines and propellers removed from the aircraft to account for the remaining balance. (*See id.*) The written agreement states in typewritten form that the price is $190,000, but the margin contains the handwritten words, "$170,000 due at contract signing, $20,000 balance due on acceptance by customer." (*See* Agreement, Doc. 16, Ex. A.)

### C. Performance

After Mr. Pezold signed the agreement, he paid Phoenix $170,000 using PAC funds. (*See* Check, Doc. 16, Ex. B.) PAC's aircraft was then delivered to Selmer, Tennessee for the upgrade. (*See* Dep. Pezold at 12, Doc. 37.)

Although Phoenix removed the old engines and propellers from the aircraft and sold them for $170,000, Phoenix never completed the upgrade. (*See* Aff. Pezold ¶¶ 3–4.) Mr. Pezold made several inquiries in the fall of 1997 about the status of his plane. Mr. Bailey, who was in charge of the upgrade, repeatedly assured Mr. Pezold that "the work would be completed soon, pending the completion of 'just one more test.'" (*Id.* ¶ 5.) Mr. Bailey told Mr. Pezold that, while the engines had been installed in the aircraft, the FAA demanded that a propeller survey be completed before the FAA would approve the installation. (*See* Dep. Pezold at 13–14, Doc.

37.) Mr. Bailey further informed Mr. Pezold that the aircraft would be moved to Sanford, Florida for the survey. (*See id.* at 14.)

In December 1997 or January 1998, Mr. Pezold learned that Megaflight, Inc. under the direction of Ron Rosenberg had purchased Phoenix and the Phoenix STC. (*See id.* at 14–15.) The original Phoenix shareholders later disputed the validity of the purchase agreement claiming that Megaflight failed to pay the purchase price. (*See* Decl. Bailey ¶¶ 15–19, Doc. 104.)

In the summer of 1998, Mr. Pezold spoke with Mr. Rosenberg on several occasions about the status of PAC's plane. Mr. Rosenberg initially said that there were problems with the Phoenix STC. (*See* Dep. Pezold at 15, Doc. 37.) Specifically, Mr. Rosenberg related that, when preparations were being made for the propeller survey, personnel from the Walter Engine Co. discovered dangerous defects in the engine mounting system used in the Phoenix STC and that Walter Engine Co. would not provide a warranty for the engines unless certain changes were made. (*See* Dep. Rosenberg at 51, Doc. 114; Decl. Bailey ¶ 25, Doc. 104.) A few months later, Mr. Rosenberg told Mr. Pezold that the Phoenix STC was fatally flawed and that Megaflight had hired Douglas Karlsen of Turbine Design, Inc.(TDI) to create a new STC that would conform to the FAA's requirements and that would qualify for the Walter Engine Co.'s warranty protection. (*See id.* at 16–17, 20–21; Aff. Pezold ¶ 5, Doc. 36.)

Mr. Rosenberg also brought Walter Engine Co.'s complaints to the attention of the FAA, which ultimately decided to revoke the Phoenix STC unless Phoenix would make certain changes in the STC. (*See* Decl. Bailey ¶¶ 38–40, 47, Doc. 104.) Sometime during the course of these events, TDI began publishing on the internet information about the defects in the Phoenix STC and about the criminal arrest record of Mr. Bailey, who had stopped working for Mr. Rosenberg in the summer of 1998. (*See id.* ¶ 46.)

### D. PAC and TDI's Loan Agreement

In December 1998, TDI informed Mr. Pezold that Megaflight had failed to pay TDI

and that TDI had run out of funding to complete the new STC. (*See* Aff. Pezold ¶ 7, Doc. 36.) To help TDI complete the new STC and thus PAC's upgrade, PAC loaned approximately $140,000 to TDI. (*See id.* ¶¶ 8–9.) The loan agreement provided in part that, if a new STC was issued and if any conversions were done pursuant to the new STC, PAC would receive a royalty up to 200% of the amount advanced to TDI plus a certain amount thereafter for each conversion. (*See* Dep. Pezold at 27, Doc. 37.) Ultimately, TDI completed the work for the new STC, and the FAA issued it on September 16, 1999. (*See* Aff. Pezold ¶ 10, Doc. 36.)

## II. Legal Standards

### A. Dismissal

A motion to dismiss tests the legal sufficiency of a plaintiff's cause of action. A court may grant a defendant's motion to dismiss only if the defendant demonstrates " 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Harper v. Blockbuster Entertainment ·Corp.*, 139 F.3d 1385, 1387 (11th Cir.1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In making this determination, a court must accept the allegations in the complaint as true and must view the allegations in the light most favorable to the plaintiff. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir.1992). A court may consider not only the allegations in the complaint itself but also any contracts and other documents attached to and described in the plaintiff's complaint. *See* Fed.R.Civ.P. 10(c) ("a copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes"); *Quiller v. Barclays American/Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir.1984); *Amfac Mortgage Corp. v. Arizona Mall*, 583 F.2d 426, 429–30 (9th Cir.1978).

### B. Summary Judgment

Summary judgment is a trial on paper. The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed.R.Civ.P. 56(e)).

Summary judgment is appropriate "if, after viewing the evidence in the light most favorable to the non-moving party, the court finds that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *See Hauser v. Life Gen. Sec. Ins. Co.*, 56 F.3d 1330, 1333 (11th Cir.1995). The party requesting summary judgment bears the initial burden of showing that no genuine issues of material fact exist. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). If the moving party meets this burden, then the burden shifts to the non-moving party to demonstrate that a material issue of fact exists to preclude summary judgment. *See id.*

## III. Discussion

### A. Phoenix's Motion to Dismiss PAC's Claims

Phoenix argues that PAC cannot recover on its declaratory judgment, breach of contract, and breach of warranty claims because Mr. Pezold, and not PAC, was a party to the agreement in issue. To determine whether Phoenix is correct, the Court must first address what law governs the agreement.

The Court, sitting with diversity jurisdiction, must apply Florida choice of law provisions to determine what law governs the case. *See Fioretti v. Massachusetts Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under Florida law, the choice of law rule differs depending upon whether the issue involves an interpretation of a contract or a failure to perform. A court addressing a contract interpretation issue must apply the rule of law where the contract was made. *See Fioretti*, 53 F.3d at 1235; *In re Estate of Santos*, 648 So.2d 277, 280 (Fla.Dist.Ct.App. 1995). In contrast, a court addressing a contract performance issue must apply the rule of law where the contract was to be performed. *See Santovenia v. Confederation*

*Life Ass'n,* 460 F.2d 805, 810 (5th Cir.1972) (quoting *Walling v. Christian & Craft Grocery Co.,* 41 Fla. 479, 489, 27 So. 46 (1899) for the notion "that matters bearing upon the execution, interpretation, and validity of a contract are determined by the law of the place where it is made [while] [m]atters connected with the performance are regulated by the law prevailing at the place of performance.").

Here, the Court is addressing the issue of whether PAC was a party to the agreement. This issue is a matter of contract interpretation because whether PAC was a party to the agreement turns in large part upon what the agreement said. Consequently, the Court must apply the rule of law where the contract was made, i.e., where the last act necessary to complete the contract was done. *See Fioretti,* 53 F.3d at 1235; *Ferrero v. Associated Materials, Inc.,* 923 F.2d 1441, 1441 (11th Cir.1991) (what matters under the lex loci contractus doctrine, which Florida has adopted, is where the last act occurred); 16 Am.Jur.2d *Conflict of Laws* § 97 (1998).

■ A contract is made under Florida law when the three elements of contract formation are present: offer, acceptance, and consideration. *See Air Prods. & Chems., Inc. v. The Louisiana Land & Exploration Co.,* 806 F.2d 1524, 1529 (11th Cir.1986). With a bilateral contract such as the one in this case, acceptance is the last act necessary to complete the contract. An acceptance is "a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." Restatement (Second) of Contracts § 50 (1979); *Morrison v. Thoelke,* 155 So.2d 889, 893 (Fla.Dist.Ct.App. 1963) (an acceptance is an "overt manifestation of assent to the proposal"); *Stevenson v. Stevenson,* 661 So.2d 367, 369 (Fla.Dist.Ct. App.1995) (requiring a "sufficient manifestation of assent"). An acceptance is effective when, and thus where, dispatched. *See* Restatement (Second) Contracts § 63 (1979) ("an acceptance made in a manner and by a medium invited by an offer is operative and completes the manifestation of mutual assent as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror"); *Morrison,* 155 So.2d at 893

(acceptance effective when sent); *Crellin Techs., Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 5 (1st Cir.1994) (under Rhode Island law similar to Florida law, acceptance during a telephone call in interstate commerce was effective in the place where the words of acceptance were uttered).

Thus, the question is, under Florida law, where did the acceptance leading to the formation of the contract occur? On the pleadings, the Court cannot answer this question.

The Court cannot tell from the pleadings, which incorporate the contract, what constituted the offer and acceptance in the subject agreement or where the acceptance occurred. Perhaps Phoenix made an offer when it sent the agreement to Mr. Pezold for his signature, and the act of Mr. Pezold signing the agreement constituted an acceptance. If that is the case, then the pleadings do not reveal where Mr. Pezold put his pen to the paper. In Tennessee at Phoenix's headquarters? In Georgia where PAC is located? Somewhere else? Alternatively, perhaps Mr. Pezold modified Phoenix's offer by replacing the typewritten payment provision with the handwritten provision, and thus Mr. Pezold's act of signing the agreement merely constituted a counteroffer, and Phoenix's acts of performance in Tennessee amounted to an acceptance. The Court simply cannot tell on the record before it, and the Court will not attempt to answer the question by applying the various laws of the land because doing so would unduly burden the Court and because the parties have not adequately prepared the Court to perform such a task.

■ Because the Court cannot determine from the pleadings what law applies, the Court cannot dismiss PAC's claims at this stage of the litigation. A motion for summary judgment may later resolve the issue. In making the decision to deny Phoenix's motion, the Court cautions PAC that PAC is probably not a party to the contract because, even though PAC owned the aircraft and Mr. Lewis issued a check to Phoenix from PAC's account, PAC is not listed anywhere in the agreement, and the agreement does not provide that Mr. Pezold signed the agreement on behalf of PAC.

*B. PAC's Summary Judgment Motion*

Phoenix claims that Mr. Rosenberg, Mr. Karlsen, PAC, and Mr. Pezold, among others, conspired to convince the FAA to revoke the Phoenix STC, to use the Phoenix STC as a basis for creating a new competing STC, and to publish defamatory information about Phoenix and its principals. PAC and Mr. Pezold challenge the sufficiency of the evidence supporting Phoenix's counterclaims.

 To establish a civil conspiracy, a plaintiff must show "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Lipsig v. Ramlawi*, Nos. 97–1890, 97–1819, 2000 WL 313534, at *7, —— So.2d —— (Fla.Dist.Ct.App. Mar.29, 2000) (quoting *Raimi v. Furlong*, 702 So.2d 1273, 1284 (Fla.Dist.Ct.App.1997) (citations omitted)). Here, the record does not support Phoenix's counterclaims because, as the counterdefendants correctly point out, there is no evidence in the record to show that Mr. Pezold or PAC knew about or participated in any unlawful activity, and thus Mr. Pezold and PAC could not have been part of the alleged conspiracy. In fact, the evidence shows that Mr. Pezold had no input into the development of the new STC, had nothing to do with the publication of the information on the internet, and instead simply wanted to get his plane back. Mr. Karlsen testified as much:

Q: And that business decision that was made with respect to moving forward with the turbine design application, who participated in making that decision?

A: Well, it was—it was—it was a mutual agreement with Ron and I[sic] . . .

Q: What involvement did Jack Pezold . . . have in that decision-making process, in any?

A: *None. He didn't even know,* I don't think. At that time, I never even spoke to him, I don't think . . .

Q: As a matter of fact . . . you actually refused to discuss the situation with him at all; isn't that right?

A: Well, yeah, that's true. I didn't—I didn't want him to keep calling me asking about his—*all he was interested in was the plane.* He didn't care about the S.T.C. so much. He knew that the S.T.C. issuance would result in getting his airplane back. I knew that.

\* \* \* \* \* \*

Q: [I]t was only after you advised Mr. Pezold that you were no longer going to work on his plane, or your S.T.C.. for lack of funding, that he ever approached you or agreed to advance you money under a loan agreement?

A: Exactly, yeah. I mean, he didn't really—*he just asked how he could get his airplane back.* And I said, the only thing that's going to do that is money. I mean, I've got a payroll to make and I had to make it.

Q: Between September of 1998 and February 9th of 1999, what involvement, if any, did Jack Pezold have in your efforts to obtain the S.T.C. that you eventually received in September of 1999?

A: *Well, he let us use his plane, but that's about it.*

Q: Did he have any active involvement in providing you technical assistance with respect to obtaining the S.T.C.?

A: *No, none whatsoever.*

Q: Did he actively participate and submit information on your behalf or your company's behalf to the FAA with respect to your obtaining the S.T.C.?

A: *No. He couldn't.* It was—he didn't even have data that we produced and he wasn't—*he didn't have anything to do with that.*

\* \* \* \* \* \*

Q: After this note was signed on February 9th of 1999, other than the advances made under the note, did Mr. Pezold or Pezold Air Charters provide you any assistance, whatsoever, with respect to your application for the S.T.C.?

A: *No. He just loaned us some money to help us finish it, that's all. And he let us use his plane to get it done . . .*

(Dep. Karlsen at 171—176, Doc. 110 (emphasis added).)

This testimony—which Phoenix has not rebutted with any other evidence—shows that Mr. Pezold and PAC did not have any knowledge of and did not participate in any of the alleged unlawful activity. Not only did Mr. Karlsen refuse to tell Mr. Pezold early on about Mr. Karlsen's and Mr. Rosenberg's efforts to go forward with the new STC application, but, once Mr. Pezold did become aware of it, PAC's only input into the new STC was to provide TDI with PAC's airplane, which still had not been upgraded, and later to loan money to TDI when TDI could not meet its payroll. Furthermore, there is no evidence that Mr. Pezold or PAC had anything to do with TDI's publication of the allegedly defamatory information on the internet. (*See* Aff. Pezold ¶ 11, Doc. 35; Dep. Karlsen at 115–16, Doc. 110.)

Absent evidence that Mr. Pezold or PAC knew of or participated in some wrongdoing, the mere contractual relationship between PAC and TDI is not enough to tie PAC to the alleged conspiracy. This is particularly true because, after PAC waited over fifteen months for Phoenix to meet its contractual obligations, it hardly seems suspicious that PAC sought to mitigate its damages by loaning money to TDI to complete the upgrade.

Phoenix cannot adduce any evidence to show that Mr. Pezold or PAC knew of or participated in any wrongdoing. While Phoenix produced over 1,300 pages of evidence, the bulk of it dealt with establishing a conspiracy between Mr. Karlsen and Mr. Rosenberg—not Mr. Pezold or PAC. Of the minimal evidence mentioning Mr. Pezold or PAC, none of it even supports the weakest inference that Mr. Pezold or PAC were involved in the alleged conspiracy.

The Declaration of William Gordon Bailey (Doc. 104) is a typical example of Phoenix's evidence. In the declaration, Mr. Bailey provides a detailed account of the development of the Phoenix STC, the stock purchase of Phoenix by Megaflight, the problems with the Phoenix STC raised by Walter Co. and the FAA, and the creation of a new competing STC by Mr. Rosenberg and Mr. Karlsen. In this detailed account spanning 52 paragraphs and 20 pages, Mr. Pezold and PAC are mentioned only three times: in paragraph 12 to show that Mr. Pezold contracted with Phoenix for an upgrade, in paragraph 49 to show that Mr. Pezold loaned money to TDI, and in paragraph 51 to recite the conclusion that "Jack Pezold [has] aided and abetted Rosenberg in achieving this objective of obtaining a competing STC . . ." The declaration—which is representative of the other depositions and documents submitted by Phoenix—only shows a mere contractual relationship between Mr. Pezold and TDI. It says nothing about Mr. Pezold's or PAC's knowledge of or participation in any wrongdoing.

Phoenix makes much of the fact that the PAC loan agreement with TDI allowed PAC to receive royalty payments in exchange for the loan to TDI. Yet, this hardly seems to implicate PAC in the alleged conspiracy. Instead, it shows Mr. Pezold's business acumen. Mr. Pezold was taking on significant risk by loaning a substantial amount of money to a company that did not have the resources to even meet its payroll. Consequently, Mr. Pezold prudently wanted to secure his loan with some interest in the project itself.

In addition to Phoenix's argument that the contractual relationship proves Mr. Pezold's involvement in the alleged conspiracy, Phoenix also adduces the testimony of Christopher Batcheller, a TDI technician who worked on Mr. Pezold's plane, to show "Pezold's Knowledge of Unlawful Acts." (*See* Supp.App. to Phoenix Corp.'s Resp. at (f)(1).) Mr. Batcheller's testimony falls far short of the mark. While Mr. Batcheller says that he did see some drawings from the Phoenix STC when he worked on Mr. Pezold's aircraft, his testimony says nothing about what Mr. Pezold knew about the development of the new STC. (*See id.*)

After mining Phoenix's mountain of evidence, the Court can find no evidence that could support a finding that Mr. Pezold or PAC were involved in any conspiracy to undermine the Phoenix STC, to create a new competing STC using Phoenix's trade secrets, or to publish defamatory information on the internet. Therefore, summary judg-

**728**

ment is warranted. Also, because the evidence is so lacking, the Court will order Phoenix and its counsel to show cause why they should not be sanctioned under Rule 11 for bringing the counterclaims against PAC and Mr. Pezold.

### C. *Phoenix's Motion to Voluntarily Dismiss Its Counterclaims*

Phoenix moves to voluntarily dismiss its counterclaims pursuant to Federal Rule of Civil Procedure 41(a)(2). The Court will deny this motion on two alternative grounds. First, the motion is moot because the Court has already disposed of the counterclaims on summary judgment.

Second, the Court declines to exercise its discretion to allow voluntary dismissal because voluntary dismissal would result in plain prejudice to PAC and Mr. Pezold. The Court has discretion to grant or deny a Rule 41(a)(2) motion for voluntary dismissal. *See Fisher v. Puerto Rico Marine Management, Inc.,* 940 F.2d 1502, 1502–3 (11th Cir.1991). Voluntary dismissal should be allowed under Rule 41(a)(2) unless the defendant will suffer some "plain prejudice other than the mere prospect of a second lawsuit." *Id.* To determine whether a defendant will suffer plain legal prejudice, the Court should consider such factors as "the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and whether a motion for summary judgment has been filed by the defendant." *Grover v. Eli Lilly & Co.,* 33 F.3d 716, 718 (6th Cir. 1994).

Here, Phoenix's motion would impose plain legal prejudice on PAC because the parties and Court have invested significant resources in resolving PAC's motion for summary judgment on Phoenix's counterclaims, trial is less than four months away, and Phoenix offers no reason to justify its voluntary dismissal at this late stage. Moreover, the fact that Phoenix's counterclaims are unsupported by any evidence suggests that Phoenix never expected to succeed on its frivolous counterclaims and instead raised those claims only to increase PAC and Mr.

Pezold's litigation costs. The Court will not allow Phoenix to use a motion for voluntary dismissal as a means to avoid the consequences of its actions. *See, e.g., Radiant Tech. Corp. v. Electrovert USA Corp.,* 122 F.R.D. 201, 203 (D.C.Tex.1988) ("Outright dismissal should be refused, however, when a plaintiff seeks to circumvent an expected adverse result."); *Fleming v. Joy Fin. Co.,* No. Civ.A. 95–3464, 1995 WL 739877, at *1 (E.D.La. Dec.11, 1995) (same). Because Phoenix's motion for voluntary dismissal is moot and because voluntary dismissal would impose plain legal prejudice on PAC, Phoenix's motion for voluntary dismissal must be denied.

### IV. Disposition

Based upon the foregoing, the Court:

1) **DENIES** Phoenix's motion to dismiss PAC's claims (Doc. 132);

2) **GRANTS** PAC's motion for summary judgment on Phoenix's counterclaims (Doc. 33) and **ORDERS** Phoenix and its counsel to show cause why they should not be sanctioned under Rule 11;

3) **DENIES** Phoenix's motion for voluntary dismissal of Phoenix's counterclaims (Doc. 133);

4) **DENIES** as moot Phoenix's motion to extend time to respond to counterclaim defendants' motion for summary judgment (Doc. 45); and

5) **DENIES** as moot PAC's motions to strike Phoenix's summary judgment response (Doc. 119); to strike Phoenix's supplemental appendix (Doc. 120); to strike the declaration of William Gordon Bailey (Doc. 125); and to file supplemental authority in support of its motions to strike (Doc. 131).

This order disposes of Phoenix's counterclaims against PAC and Mr. Pezold. The case will proceed on PAC's claims against Phoenix.